James P. **HARRISON**, Petitioner,

v.

Rondle **ANDERSON**, Superintendent, Respondent.

No. IP 99–0933–C–B/S.

United States District Court, S.D. Indiana, Indianapolis Division.

Jan. 22, 2004.

Joseph M Cleary, Hammerle & Allen, Indianapolis, IN, for Plaintiff.

Priscilla J. Fossum, Office of Attorney General, Indianapolis, IN, for Defendant.

## ENTRY ON PETITION FOR WRIT OF HABEAS CORPUS

BARKER, District Judge.

James Patrick Harrison ("Harrison") was convicted of murder and arson in the Posey Circuit Court. He was also determined to be an habitual offender. He was sentenced to death for the two murders of which he had been found guilty. After challenging his conviction and sentence in the Indiana courts, he brought the present action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a).

For the reasons explained in this Entry, Harrison's petition for a writ of habeas corpus must be **granted.**

## I. BACKGROUND

### A. State Proceedings

The bodies of 20–year old Stacy Forsee, her daughter Tia Forsee (age 3½), and her son Jordan Hanmore (age 21 months) were found in the charred remains of Stacy's home in the early morning hours of January 17, 1989. Stacy had been stabbed and the children had died in the fire. After an investigation that spanned more than two years, Harrison was charged with arson, with the knowing murders of Stacy and Tia, and with the felony murder of Jordan. The evidence presented at trial included the following: (1) Harrison was observed near the fire scene on the night of the murders before the fire trucks arrived; (2) Harrison had purchased kerosene days before the murders; (3) the fire had been started by a flammable liquid; and (4) Harrison told fellow inmates in a Maryland jail that he had committed the crimes.

Charges against Harrison were filed on April 18, 1991, for arson, two counts of knowing murder and one count of felony murder. The action was docketed in the Posey Circuit Court as No. 65C01–9104–CF–0008. Harrison's initial hearing occurred on April 29, 1991. Attorneys Thomas Swain and Ronald Warrum were appointed as Harrison's counsel and the trial was set for January 6, 1992.

During pre-trial proceedings, Harrison sought a change of venue from the judge, the Honorable James Redwine. After Judge Redwine denied that request, Harrison filed an original action with the Indiana Supreme Court to compel a change of judge. The Indiana Supreme Court declined to issue a writ granting the relief Harrison sought.

Harrison's trial commenced on November 6, 1991. The guilt phase concluded on November 15, 1991, with the jury acquitting Harrison of Stacy Forsee's murder, but finding him guilty of the remaining counts. The jury recommended that Harrison be sentenced to death for the murders of both Tia Forsee and Jordan Hanmore, and the trial court imposed the death sentence for both counts on December 14, 1991.

The convictions were affirmed on direct appeal in *Harrison v. State*, 644 N.E.2d 1243 (Ind.1995), but the case was remanded to the trial court for the preparation of a capital sentencing order. After the trial court complied with the remand, the imposition of the death sentence was affirmed in *Harrison v. State*, 659 N.E.2d 480 (Ind.

1995). The trial court's subsequent denial of Harrison's petition for post-conviction relief was affirmed on appeal in *Harrison v. State*, 707 N.E.2d 767 (Ind.1999).

## B. Harrison's Claims

Harrison presents eleven claims in this habeas proceeding, as follows:

- Harrison was denied his right to counsel and trial counsel rendered ineffective assistance during the guilt phase of his trial.
- The trial court improperly disallowed the presentation of alibi evidence.
- The trial court incorrectly excluded evidence that someone else did the crime.
- The trial court erred when it denied him expert assistance.
- The trial court was biased against Harrison.
- Exculpatory evidence was suppressed.
- The State destroyed or lost material evidence.
- Harrison was denied his right to counsel and trial counsel assisted him ineffectively during his penalty phase.
- Victim evidence was improperly admitted.
- Harrison was denied the effective assistance of counsel in his direct appeal.
- On remand, the Indiana Supreme Court incorrectly reviewed Harrison's death sentence after finding an improper aggravating circumstance.

As is made evident in this Entry, one asserted error controls the disposition of the case. That is the claim of judicial bias.

## C. Indiana's Capital Punishment Statute

In assessing Harrison's petition, we start with a broad explanation of Indiana's capital punishment adjudication process. At the time of Harrison's trial and sentencing, 30 of the 37 states that provided for the death penalty gave the life-or-death decision solely to the jury.[1] Of the remaining seven states, only Florida, Alabama and Indiana allowed a judge to override a jury's recommendation against death. *Spaziano v. Florida*, 468 U.S. 447, 463 & n. 9, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984).

The Indiana Supreme Court has described the operation of Indiana's capital sentencing scheme, set forth in IND. CODE § 35–50–2–9, in the following terms:

> Our death penalty statute provides three distinct steps which the trial court must take in reaching its sentencing decision in cases in which the jury has found the defendant guilty of Murder and the State seeks the death penalty. First, the trial court must find that the State has proved beyond a reasonable doubt that at least one of the aggravating circumstances listed in the death penalty statute exists. Second, the trial court must find that any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances. This evaluation and weighing process should be described in the trial court's sentencing statement. Third, before making the final determination of the sentence, the trial court must consider the jury's recommendation. However, the death penalty statute also pro-

---

1. Indiana's statute was amended, effective July 1, 2002. The current statute provides that (i) the court shall instruct the jury that, in order for the jury to recommend to the court that the death penalty or life imprisonment without parole should be imposed, the jury must find at least one (1) aggravating circum-

stance beyond a reasonable doubt as described in subsection (k) and shall provide a special verdict form for each aggravating circumstance alleged, and (ii) if the jury reaches a sentencing recommendation, the court shall sentence the defendant accordingly. IND. CODE § 35–50–2–9.

vides that the trial court is not bound by the jury's recommendation.

*Roark v. State,* 644 N.E.2d 565, 570 (Ind. 1994).

## II. SCOPE AND STANDARD OF REVIEW

### A. AEDPA

Harrison seeks relief in this action pursuant to 28 U.S.C. § 2254(a). In the exercise of its habeas jurisdiction, a federal court may grant relief only if the petitioner shows that he is in custody "in violation of the Constitution or laws of the United States." 28 U.S.C. § 2254(a).

When a habeas petition is filed after enactment of the Antiterrorism and Effective Death Penalty Act (AEDPA) on April 24, 1996, that Act's restrictions on federal review of state court rulings apply to the case. *Henderson v. Walls,* 296 F.3d 541, 545 (7th Cir.2002). The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). Under the AEDPA, a writ of habeas corpus may be granted only if Harrison demonstrates that the state court's adjudication of the claim was contrary to, or an unreasonable application of, federal law as determined by the United States Supreme Court, *see* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor,* 529 U.S. 362, 403–04, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), or if the decision was premised on an unreasonable determination of facts. *See* 28 U.S.C. § 2254(d)(2). The centerpiece of this statute in most cases, Section 2254(d)(1), demands that state-court decisions be given the benefit of the doubt. *See Woodford v. Visciotti,* 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2003) (per curiam) (citation and quotation omitted). Nonetheless, deference by definition does not preclude

relief. *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

 This deferential standard only applies, however, to claims which the Indiana courts adjudicated on their merits. *See Ouska v. Cahill–Masching,* 246 F.3d 1036, 1046 (7th Cir.2001); *Braun v. Powell,* 227 F.3d 908, 916–17 (7th Cir.2000). Additionally:

> If the state court's opinion *was* unreasonable—or if the state judiciary did not address the constitutional claim, despite an opportunity to do so—then § 2254(d) no longer applies. A prisoner still must establish an entitlement to the relief he seeks, and it is § 2254(a), not § 2254(d), that sets the standard: the court issues "a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

*Aleman v. Sternes,* 320 F.3d 687, 690 (7th Cir.2003).

Factual issues determined by a state court are presumed to be correct, and the petitioner bears the burden of rebutting this presumption by clear and convincing evidence. *Werts v. Vaughn,* 228 F.3d 178, 196 (3d Cir.2000) (*citing* 28 U.S.C. § 2254(e)(1)). This is a "rigorous burden of proof." *Sanchez v. Gilmore,* 189 F.3d 619, 623 (7th Cir.1999). *See also Green v. White,* 232 F.3d 671, 672 n. 3 (9th Cir.2000) (although "the relationship between § 2254(d)(2) and § 2254(e)(1) is not entirely clear ... the standard of review appears to be clear error under both statutory provisions.").

### B. Procedural Default

 In addition to the substantive standard set out above, "[i]t is the rule in this country that assertions of error in criminal

proceedings must first be raised in state court in order to form the basis for relief in habeas. Claims not so raised are considered defaulted." *Breard v. Greene*, 523 U.S. 371, 375, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998) (citing *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)).

▮▮▮ Procedural default is a facet of certain of Harrison's habeas claims. Procedural default occurs either: (1) when a petitioner failed to exhaust state remedies and the court to which he would have been permitted to present his claims would now find such claims procedurally barred, *Coleman v. Thompson*, 501 U.S. 722, 735 n. 1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); or (2) "if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Id.*, at 729, 111 S.Ct. 2546; *see also Williams v. Parke*, 133 F.3d 971, 973 (7th Cir.1997); *Aliwoli v. Gilmore*, 127 F.3d 632, 634 (7th Cir.1997). The consequence of presenting in a federal habeas petition a claim which has been procedurally defaulted is quite clear:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750, 111 S.Ct. 2546. "Cause" for a procedural default exists if the petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Prejudice is demonstrated by showing that the errors worked to the petitioner's "actual and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982). The Supreme Court has equated the miscarriage of justice standard with a claim of actual innocence. *See Sawyer v. Whitley*, 505 U.S. 333, 339, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992). And, in order to establish a claim of actual innocence "[t]he prisoner must 'show a fair probability that in light of all the evidence [including that which was illegally obtained as well as that which was legally excluded] ... the trier of facts would have entertained a reasonable doubt of his guilt.'" *Kuhlmann v. Wilson*, 477 U.S. 436, 455 n. 17, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986) (quoting Henry J. Friendly, **Is Innocence Irrelevant? Collateral Attack on Criminal Judgments**, 38 U. CHI. L. REV. 142, 160 (1970)).

## III. DISCUSSION

### A. The Nature of Asserted Error

▮▮▮ There are two kinds of constitutional error at trial. In *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the Supreme Court recognized a distinction between structural defects, which require reversal, *per se*, and trial errors, which require a reviewing court to engage in harmless error analysis. Structural defects are "defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards." *Id.* at 309, 111 S.Ct. 1246. A "structural error" applies to the entire trial and requires reversal because it "infects the entire trial process," *Brecht v. Abrahamson*, 507 U.S. 619, 630, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). Furthermore, a structural error will "'necessarily render a trial fundamentally unfair.'" Put another way, these errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function

as a vehicle for determination of guilt or innocence ... and no criminal punishment may be regarded as fundamentally fair.'" *Neder v. United States,* 527 U.S. 1, 8–9, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (quoting *Rose v. Clark,* 478 U.S. 570, 577–78, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986)). A trial error, on the other hand, is an "error which occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt." *Id.* at 307–08, 106 S.Ct. 3101. A right is "substantial" when it is one of the pillars of a fair trial. Trial before an orangutan, or the grant of summary judgment against the accused in a criminal case, would deprive the defendant of a "substantial" right even if it were certain that a jury would convict. *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

Structural errors have been found in a "very limited class of cases." *Johnson v. United States,* 520 U.S. 461, 468–69, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (citing precedent finding structural errors for: (1) a total deprivation of the right to counsel; (2) lack of an impartial trial judge; (3) unlawful exclusion of grand jurors on the basis of race; (4) denial of the right to self-representation at trial; (5) denial of the right to a public trial; and (6) an erroneous reasonable doubt instruction to the jury).

**B. The Right to an Unbiased Judge**

 Criminal defendants have a constitutional right to be tried before a fair and impartial judge. *Bracy v. Gramley,* 520 U.S. 899, 904–05, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). The due process clause "requires that a defendant receive a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular

case." *Id.* (citations omitted); *see also In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases.").

 Within the framework of structural/trial error explained in Part III.A. of this Entry, a biased tribunal always deprives the accused of a substantial right. *Bracy v. Gramley,* 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997); *Gomez v. United States,* 490 U.S. 858, 876, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (same); *Cartalino v. Washington,* 122 F.3d 8 (7th Cir. 1997).

**C. Procedural Status of Claim of Judicial Bias**

Before the substance of Harrison's claim of judicial bias can be addressed, a preliminary matter must be resolved. This is the respondent's argument of procedural default.

 The respondent argues that the claim of judicial bias is "twice defaulted," because (1) Harrison "never fairly presented it to the state courts," and (2) the Indiana Supreme Court "adjudicated the claim on independent and adequate state grounds." We conclude that neither of these procedural arguments is persuasive.

The respondent acknowledges that "Judge Redwine's alleged bias has been substantially litigated," yet claims that Harrison "never raised Judge Redwine's alleged bias before his trial as violation [sic] of his federal constitutional right to due process." This contention turns a blind eye to what occurred. The due process argument was explicitly presented in Harrison's mandamus petition to the Indiana Supreme Court at the outset of his prosecution. The argument was renewed

in Harrison's direct appeal. The Indiana Supreme Court acknowledged that Harrison was seeking relief based on his claim that he was denied a fair and impartial trial because of the denial of his motion for a change of venue from the judge. The Indiana Supreme Court concluded that Harrison "state(d) no facts in his brief. . . , nor can we find any in the record, that indicate that there was an undisputed claim of prejudice or that the trial court expressed an opinion on the merits of the controversy." *Harrison v. State*, 644 N.E.2d 1243, 1249 (Ind.1995). Whether correct in that assessment of the claim, the Indiana Supreme Court clearly recognized Harrison's claim of judicial bias precisely as it has been reasserted here. There was, accordingly, no failure by Harrison to "fairly present" his claim of judicial bias to the Indiana state courts. *See Ellsworth v. Levenhagen*, 248 F.3d 634, 639 (7th Cir. 2001) ("The bottom line is that the task of the habeas court in adjudicating any issue of fair presentment is assessing, in concrete, practical terms, whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis.") (quotations omitted).

The respondent also contends that Harrison committed procedural default on the claim of judicial bias because the Indiana Supreme Court adjudicated the claim on independent and adequate state grounds. If true, this triggers the federal doctrine of procedural default because:

> "when a state court has declined to address a prisoner's federal claims because the prisoner ha[s] failed to meet a state procedural requirement," the independent and adequate state grounds doctrine bars federal review of that state court judgment.

*Thomas v. McCaughtry*, 201 F.3d 995, 1000 (7th Cir.2000) (quoting *Coleman*, 501 U.S. at 729–30, 111 S.Ct. 2546). No procedural rule was cited by the Indiana

Supreme Court either in its Order denying Harrison's mandamus petition or in Harrison's direct appeal on this point. Our interpretation of the Indiana Supreme Court action in rejecting the claim in Harrison's direct appeal was simply to explain that it had found no *facts establishing* Harrison's claim of prejudice. This was a decision on the merits of the claim as the Indiana Supreme Court perceived it; it was not a decision based on a failure to comply with some procedural requirement of state law. *Braun v. Powell*, 227 F.3d 908 (7th Cir.2000) (issues not adjudicated on the merits because they were overlooked or deemed defaulted do not qualify as adjudications on the merits within the meaning of the AEDPA and as such are also exempt from its reach).

On the basis of the foregoing, therefore, we *reject* the respondent's contentions that Harrison committed procedural default as to his claim of judicial bias.

### D. State Court Treatment of Claim of Judicial Bias

The Indiana Supreme Court was presented with various facets of Harrison's claim of judicial bias on three separate occasions. The first occasion was in Harrison's mandamus petition prior to trial, the second was in Harrison's direct appeal, and the third was in Harrison's appeal from the denial of his petition for post-conviction relief. The third occasion has scant relevance here, because it dealt with Judge Redwine's alleged bias in the post-conviction proceeding, rather than before or during trial, and "[u]nless state collateral review violates some independent constitutional right, such as the Equal Protection Clause, . . . errors in state collateral review cannot form the basis for federal habeas corpus relief." *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir.), *cert. denied*, 519 U.S. 907, 117 S.Ct. 266, 136 L.Ed.2d 190 (1996). Thus, we limit

our analysis to the Indiana Supreme Court's treatment of the claim of judicial bias in both the mandamus action and in Harrison's direct appeal.

 The reasoning behind the Indiana Supreme Court's treatment of the judicial bias claim in the mandamus action escapes easy understanding. In *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002), the Supreme Court explained that the effect of § 2254(d)(1)'s limitation on habeas relief does not turn on the state courts' "citation of [Supreme Court] cases—indeed, it does not even require *awareness* of [those] cases, so long as neither the *reasoning* nor the *result* of the state-court decision contradicts them." Thus, the absence of an expressed rationale by the Indiana Supreme Court on this point does not preclude AEDPA deference, but is nonetheless important in determining whether the state court recognized and adjudicated the federal issue which was presented. In Harrison's direct appeal, the Indiana Supreme Court explained its standard of review as follows:

> A ruling for a change of judge in a criminal proceeding is within the trial court's discretion. We review such a ruling only for a clear abuse of discretion.

*Harrison v. State*, 644 N.E.2d 1243, 1249 (Ind.1995). This statement seems clear enough regarding the standard which was used and the manner in which the claim of judicial bias was perceived. Even so, the Indiana Supreme Court explained in its decision affirming the denial of Harrison's petition for post-conviction relief that it "held on direct appeal that the trial court did not abuse its discretion in denying the motion for change of judge." *Harrison v. State*, 707 N.E.2d 767, 778 n. 13 (Ind.1999). There is no basis to find that the Indiana

Supreme Court used a different standard in denying the relief sought by Harrison in his mandamus action prior to trial than in his direct appeal. This repeated reference to an "abuse of discretion standard" persuades us that Harrison's claim of judicial bias was not perceived by the Indiana Supreme Court in federal constitutional terms, but was perceived solely as asserted error of state law. *See United States v. Oliver*, 118 F.3d 562, 565 n. 3 (7th Cir. 1997) ("rather than a specific ruling" governed by the abuse of discretion factors, appellant "desired to make a constitutional claim.").

The manner in which the Indiana Supreme Court perceived and treated Harrison's claim of judicial bias is significant in determining whether the deference commanded by AEDPA applies here.

 The deferential standard applicable under the AEDPA has been explained in Part II.A. of this Entry. This deferential standard only applies, however, to claims which the Indiana courts adjudicated on their merits. *Newell v. Hanks*, 335 F.3d 629 (7th Cir.2003) (citing cases), which means an adjudication on the merits of the federal issue involved. In this case, it is evident from its own words that the Indiana Supreme Court did not understand Harrison's claim of judicial bias as presenting a question of federal constitutional import, and in consequence it cannot be concluded that the Indiana Supreme Court reached the merits of the federal claim which Harrison presents in his habeas petition. *See Chadwick v. Janecka*, 312 F.3d 597, 606 (3d Cir.2002) (if state court misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, AEDPA's deferential standards of review are inapplicable).[2] As pointed out in Part II.A. of

---

**2.** If the Indiana Supreme Court had not made clear its use of the "abuse of discretion" stan-

dard in Harrison's direct appeal, but had simply rendered a decision, that decision may

this Entry, "if the state judiciary did not address the constitutional claim, despite an opportunity to do so—then § 2254(d) no longer applies." *Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir.2003). Our conclusion that the Indiana Supreme Court did not address the constitutional issue presented by Harrison's claim of judicial bias is reinforced by the respondent's failure to argue that AEDPA deference applies to its decisions.

■■■■ Even if the decisions of the Indiana Supreme Court in the mandamus action and in Harrison's direct appeal could be construed as decisions "on the merits" of Harrison's claim of judicial bias, which would trigger the deferential AEDPA standard, those decisions run afoul of the "contrary to" prong of § 2254(d)(1). A state court decision may be contrary to Supreme Court precedent in two ways, *Williams*, 529 U.S. at 405, 120 S.Ct. 1495. "First, a state-court decision is contrary to this Court's precedent if the state court arrives at a conclusion opposite to that reached by this Court on a question of law." *Id.* "Second, a state-court decision is also contrary to this Court's precedent if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Id.* To meet this standard, "the state court's decision

must be substantially different from the relevant precedent of this Court." *Id.* Under § 2254(d)(1)'s "contrary to" clause, a federal habeas court reviews the state court decision *de novo* to determine, as a question of law, what is clearly established law as determined by the Supreme Court and whether the state court decision is contrary to Supreme Court law. *See Schaff v. Snyder*, 190 F.3d 513, 522 (7th Cir.1999).

■■■■ The decisions of the Indiana Supreme Court on the question of judicial bias are contrary to Supreme Court precedent under the first of the *Williams* factors above. This conclusion rests on (1) the Indiana Supreme Court's use of an "abuse of discretion" standard, and (2) the Indiana Supreme Court's reference to the absence of prejudice in the trial record, juxtaposed with the proper federal standard of "a fair trial in a fair tribunal before a judge with no actual bias against the defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904–05, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997). Not only did the Indiana Supreme Court fail to articulate the proper federal test, but it articulated a test—abuse of discretion, prejudice to the defendant—wholly incompatible with the nature of structural error, for which preju-

---

have been entitled to AEDPA deference. The Supreme Court has recently reviewed this principle:

> A state court's decision is not "contrary to ... clearly established Federal law" simply because the court did not cite our opinions. We have held that a state court need not even be aware of our precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them."

*Mitchell v. Esparza*, —— U.S. ——, 124 S.Ct. 7, 10, 157 L.Ed.2d 263 (2003) (citing *Early v. Packer*, 537 U.S. 3, 7–8, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam)).

The present situation is somewhat analogous to a situation where "a state court's

ruling does not make clear whether a claim was rejected for procedural or substantive reasons and where the record does not otherwise preclude the possibility that the claim was denied on procedural grounds, [in which case] AEDPA deference is not given, because we cannot say that the state court's decision was on the merits." *Shih Wei Su v. Filion*, 335 F.3d 119, 126 n. 3 (2d Cir.2003) (citing *Miranda v. Bennett*, 322 F.3d 171, 178 (2d Cir.2003)). Additionally, a federal court must take the decision of a state court as it exists, and cannot construct possible rationales which are contrary to the stated reasoning of the state court. *Van Lynn v. Farmon*, 347 F.3d 735 (9th Cir.2003).

dice is *not required, Neder,* 527 U.S. at 14, 119 S.Ct. 1827 (structural errors implicate basic protections, and render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence; it is a categorical determination rather than a case-specific one); *Satterwhite v. Texas,* 486 U.S. 249, 256–57, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (the error is structural; it "contaminate[s] . . . the entire . . . proceeding" and "any inquiry into its effect on the outcome of the case would be purely speculative."). Where structural error is implicated, and judicial bias is one of the narrow class of constitutional violations in which structural error is implicated, harmless error (the obverse of prejudice, in the present context), is not an option. *Tyson v. Trigg,* 50 F.3d 436, 442 (7th Cir.1995) ("There are . . . types of constitutional error . . . that the Supreme Court has said cannot be overlooked on grounds of harmlessness. These include actual bias by the judge. . . ."), *cert. denied,* 516 U.S. 1041, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996). The Indiana Supreme Court's "abuse of discretion standard" recited and applied in Harrison's direct appeal in our judgment contradicts Supreme Court precedent.[3]

In summary, therefore, whether based on the conclusion that the Indiana Supreme Court did not reach the constitutional question presented or on the conclusion that it did so, but reached a decision contrary to Supreme Court precedent, its decision as to Harrison's claim of judicial bias is not entitled to the deference usually afforded under § 2254(d)(1). With the AEDPA's deferential standard inapplicable here, we shall undertake to apply the proper federal constitutional standard. *Winters v. Miller,* 274 F.3d 1161, 1167 (7th Cir.2001).[4]

### E. Harrison's Specifications of Judicial Bias

Harrison delineates ten grounds to illustrate judicial bias by Judge Redwine, as follows:

1. Judge Redwine denied the motion for change of judge after taking on the role of an advocate.

2. Judge Redwine undertook affirmative steps which impeded the defense's ability to prepare for trial, after learning that Stacy Forsee had made allegations concerning him and that the defense intended to use those allegations to frame a defense.

3. Judge Redwine granted the state's motion, filed two days before trial to exclude all of the evidence regarding Forsee's allegations to the Indiana State

---

3. The pertinent Supreme Court law is that in existence "as of the time of the relevant state-court decision." *Williams v. Taylor,* 529 U.S. at 412, 120 S.Ct. 1495. The Seventh Circuit has confirmed that *Bracy* did not establish a new rule of constitutional law. *Outlaw v. Sternes,* 233 F.3d 453, 455 (7th Cir.2000) ("Nothing in the Court's opinion in *Bracy* suggests that the Justices thought that they were doing anything novel. They applied a long-established principle—that the due process clause forbids trial before a biased judge—to a particular claim.").

4. The second prong of § 2254(d)(1) provides that a writ of habeas corpus may not issue

unless "the state court's adjudication of the claim was . . . an unreasonable application of, federal law as determined by the United States Supreme Court." The meaning of this prong has been construed as follows: "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case certainly would qualify as a decision 'involv[ing] an unreasonable application of . . . clearly established Federal law.'" *Williams,* 529 U.S. at 407–08, 120 S.Ct. 1495. The "unreasonable application" prong eludes application here because, at a minimum, the Indiana Supreme Court did not "correctly identif[y] the governing legal rule."

Police, without the defense having an opportunity to respond to the motion.

4. Judge Redwine's rulings were not evenhanded; all were against Harrison.

5. Judge Redwine took other actions which must be presumed to have been evidence of actual bias.

6. Judge Redwine was aware that Forsee's report to the Indiana State Police was relevant to Harrison's defense.

7. At the time of the change of judge hearing, Judge Redwine was made aware that the Indiana State Police might soon be investigating Stacy Forsee's allegations with regard to public officials, including Judge Redwine.

8. Judge Redwine exhibited anger and made statements which reflect that the judge interpreted the change of judge motion as a personal attack against him.

9. Judge Redwine articulated his personal feelings regarding the insufficient factual basis for the change of judge motion.

10. At the change of judge hearing, Judge Redwine again expressed concern that the change of judge allegations constituted a personal attack on him.

### F. Methodology and Burden

■■■■ In reviewing a judicial bias claim, we employ the initial presumption that the assigned trial judge properly discharged his official duties. *See Bracy*, 520 U.S. at 909, 117 S.Ct. 1793 (quotations and citation omitted). This presumption can only be rebutted by specific facts of judicial impropriety. *Aleman v. Honorable Judges of Circuit Court of Cook County*, 138 F.3d 302, 307 (7th Cir.1998).

The parties disagree on the pivotal point of whether the habeas petitioner must show actual bias or whether an appearance of judicial bias will suffice. This point was surveyed in some detail by the majority in *Bracy v. Schomig*, 286 F.3d 406, 410–411

(7th Cir.2002), where a majority of the *en banc* Court of Appeals concluded that:

> ordinarily "actual bias" is not required, the appearance of bias is sufficient to disqualify a judge.

*Id.* at 411. In *Bracy*, however, on remand from the Supreme Court, the Seventh Circuit considered only the question of actual bias, viewing its consideration of the question of actual bias to be so limited by the Supreme Court's decision. Similarly, here, actual bias has been demonstrated, and thus obviating the need to address presumed bias as a basis for federal habeas relief, or if so whether relief on that basis would be appropriate here.

■■■■ Certain principles inform our determination of whether a particular proceeding was tainted by actual judicial bias.

- To prevail in a deprivation of due process claim, a petitioner must show a level of bias that made "fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). A federal habeas court looks to "the Supreme Court's decision in *[Liteky]* to provide the standard for deciding judicial bias claims; in that case, the Court explained that 'the pejorative connotation of the terms 'bias' and 'prejudice' demands that they only be applied to judicial predispositions that go beyond what is normal and acceptable.'" *Alley v. Bell*, 307 F.3d 380, 386 (6th Cir.2002) (quoting *Liteky v. United States*, 510 U.S. at 552, 114 S.Ct. 1147).

- The *Liteky* court held that "[a] judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." 510 U.S. at 556, 114 S.Ct. 1147. The court stated that "expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the

bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display" do not establish "bias or partiality." *Id.* at 555–56, 114 S.Ct. 1147.

• Except in extreme cases, to be actionable, bias must stem from an extra-judicial source:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. *Liteky,* 510 U.S. at 555, 114 S.Ct. 1147.

*Alley v. Bell,* 307 F.3d 380, 388 (6th Cir.2002).

• "There is no harmless error analysis relevant to the issue of judicial bias." *Bracy v. Schomig,* 286 F.3d 406, 414 (7th Cir.2002) (citing *Edwards v. Balisok,* 520 U.S. 641, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997); *Cartalino v. Washington,* 122 F.3d 8 (7th Cir.1997)). "In other words, it does not matter that we might conclude that any jury would have been likely to convict … and approve death as their penalty no matter what their attorneys tried to do for them. Nor does it matter that a questionable ruling might have been found to be harmless by another court." *Bracy,* 286 F.3d at 414.

The following cases are but a few that illustrate how the Supreme Court applies these principles.

• In *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955), the Supreme Court stated "[N]o man is permitted to try cases where he has an interest in the outcome."

• In *Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927), the Court found a due process violation when a judge received a portion of the costs and fees he imposed on violators.

• In *Ward v. Monroeville,* 409 U.S. 57, 57–59, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), the Court held that the plaintiff was denied due process by a mayor sitting as a judge regarding certain ordinance and traffic violations, when a substantial portion of the city's funds were raised in connection with the mayor's court.

• In *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), the Court invalidated a ruling of the Alabama Supreme Court written by a justice who had a personal interest in the outcome of the decision.

As the Petitioner points out in a portion of his brief, the common theme of these decisions is that each "would offer a possible temptation to the average man as judge to forget the burden of proof required to convict the defendant *or which might lead him not to hold the balance nice, clear and true between the State and the accused…. " Tumey,* 273 U.S. at 532, 47 S.Ct. 437 (emphasis added).

### G. Analysis

█ In order to determine whether the trial judge engaged in "forensic misconduct", an appellate court should examine the entire trial record so as to put the judge's words in proper perspective. *Daley v. United States,* 231 F.2d 123, 128 (1st

Cir.), *cert. denied,* 351 U.S. 964, 76 S.Ct. 1028, 100 L.Ed. 1484 (1956). To assess the validity of such an attack upon the trial judge, it is necessary to read the voluminous transcript from cover to cover. *Id.*[5]

The recitation of facts in this portion of the court's decision corresponds with facts found by the trial court in its written ruling denying Harrison's petition for post-conviction relief. (PCR 920–940).[6] In addition, because neither the trial court nor the Indiana Supreme Court made specific findings as to certain matters, the recitation of those facts is based on this court's independent examination of the expanded record. Harrison has acknowledged that he does not seek an evidentiary hearing to establish his claim of trial court judicial bias, and we agree that the expanded record is adequate to fully address this claim.

1. *Motion for Change of Judge.* On July 31, 1991, during an unrecorded conference, the parties discussed with Judge Redwine that the judge's name had been brought up "in conjunction with drug information from Stacy [Forsee]. At that time, Judge Redwine indicated he would not withdraw from the case." (Writ of Mandamus, at 33, ¶ 8.) Twenty days later, Judge Redwine granted the State's oral request, over Harrison's objection, to advance Harrison's trial on the docket by two months, from January 1992 to November 6, 1991. (Tr 290.)

On September 16, 1991, Harrison filed a motion for change of judge. (Tr 721.) A hearing on that motion was conducted by Judge Redwine on September 24, 1991. (Tr 538.)

Harrison's defense had learned the following: Not long before she was killed, Stacy Forsee went to the Indiana State Police ("ISP") because she was in fear for her life. Among other things, she told the ISP that she was being followed by a suspicious van and she described the driver, that she had information about drug activity in Posey County which directly involved Roger Greathouse, and that there were prominent officials, including Judge Redwine, who were, at a minimum, present when drugs were being unloaded on Greathouse's property. (Tr 542–550; Tr 579–581; Tr 592.) This information supplied the circumstances pertinent to Harrison's defense that Stacy Forsee was targeted by the local drug community because she had knowledge of and provided information to the ISP about drug activity and that these actions made her silence necessary. This situation suggested to Harrison's attorneys that someone other than Harrison may have killed Stacy Forsee and burned down her house. A second defense theory which was emerging at that point was that Stacy Forsee's former boyfriend, Chuck Hanmore (who was also identified by the defense as involved in the drug community), had been rebuffed by Forsee and killed her to prevent her upcoming marriage to someone else.

---

**5.** Our analysis does not implicate the presumption of correctness of state court findings of fact established in 28 U.S.C. § 2254(e)(1), and no finding of fact by a state court on this subject has been challenged or called into question by this court's survey. The basis for the relief to which this court finds Harrison entitled is not based on the statutory provision that a writ of habeas corpus can be granted if the state court's determination of the facts was unreasonable in light of the evidence presented. See 28 U.S.C. § 2254(d)(2); *Williams v. Davis,* 301 F.3d 625, 631 (7th Cir.2002).

**6.** As used in this Entry, "Tr" refers to the record on appeal filed in Harrison's direct appeal, and is followed by the page number of the statement or material, and "PCR" refers to the record on appeal filed from the denial of Harrison's action for post-conviction relief, and is followed by the page number of the statement or material.

At the hearing on the motion for change of judge, Harrison established that Judge Redwine had been reported to Detective Rhoades of the ISP in the late summer of 1988 as a person aware of drug activity, that Rhoades could not investigate such allegations without first going to the Superintendent of the ISP and that there had recently been a request to interview the persons named by Stacy. (Tr 545; Tr 561–562.) Harrison also established that Rhoades' interview regarding these matters had been tape-recorded, but he had no idea what had become of the tape. (Tr 567.) Judge Redwine questioned Detective Rhoades and established through that questioning that Detective Rhoades had no reason to believe that Judge Redwine was ever at a place where drugs were. (Tr 568–570.)

ISP Detective Gilbert also testified at the hearing on Harrison's motion for change of judge. Detective Gilbert testified that Stacy Forsee had mentioned that Judge Redwine was on Greathouse's property (as was Greathouse) with a large quantity of marijuana, and that Stacy Forsee had obtained this information from Hanmore. (Tr 581–584.) This interview also was recorded, but the whereabouts of the tape were unknown.

Stacy Forsee's mother, Gloria Forsee, also testified at the hearing on the motion for change of judge. She testified that Stacy had reported to her that Judge Redwine was present on Greathouse's property where there was a large quantity of drugs, and that Stacy had also communicated to her her fears regarding Judge Redwine because of what she knew about him. Gloria Forsee also testified that she had telephoned Judge Redwine after Stacy's death inquiring as to his knowledge of Greathouse and other individuals Stacy had mentioned. She testified that during this call Judge Redwine had denied having any knowledge of Greathouse except

through court, and indicated that he was owed an apology. (Tr 668–670; 691–696.) During this testimony, Judge Redwine admonished Harrison's attorneys, stating that the motion should have been more thoroughly investigated, more thoroughly thought out. Judge Redwine acknowledged from the bench that the allegations made by Harrison in the motion for change of judge "reflect[ ] upon the credibility of this Court...." He characterized the actions of Harrison's counsel in filing the motion for change of judge as "act[ing] ... irresponsibly." (Tr 610–612.)

The same day the change of judge motion was filed, Judge Redwine telephoned Greathouse's parents home looking for him. (Tr 721.) In a telephone conversation with Greathouse that day, Judge Redwine shared with Greathouse the facts asserted in the motion for change of judge. Judge Redwine asked Greathouse to come to the scheduled hearing. (Tr 719–720.)

During Harrison's presentation of evidence in support of his motion for change of judge, Judge Redwine himself presented evidence.

• Judge Redwine had served as the judge in the criminal case of John Forsee, Stacy's brother. As part of the motion for change of judge in Harrison's case, Judge Redwine took judicial notice of at least some of the records from John Forsee's criminal case. Judge Redwine determined that there was a factual basis for John Forsee's guilty plea. (Tr 627–28.)

• Judge Redwine ordered the records in Jordan Hanmore's (Stacy's son) paternity action to be made public for Harrison's case and ordered the records to be made exhibits. Judge Redwine stated that he would have the tape of the paternity action played in open court. The tape was played. Judge Redwine stated as the reason for such action that:

since the allegation appeared to be that somehow I was rude to Stacy Forsee and that somehow I had determined some type of visitation arrangement. Because of the import of this particular case and the allegations made against the Judge in this case, I think it is important that there not be any question of bias or prejudice.... I do want to play that tape because, because I think it is important that no one in this courtroom believe that this Court is prejudiced one way or the other.
(Tr 628–29.)

● During the hearing on the motion for change of judge, Judge Redwine questioned Stacy Forsee's attorney, Beth Ellen McFadin Higgins, regarding Judge Redwine's treatment of Stacy Forsee (during the paternity proceedings). Before questioning Ms. Higgins, Judge Redwine stated that his court reporter left a message with Ms. Higgins' office for her to come and listen to the tape of the paternity hearing. (Tr 632). Judge Redwine then asked Ms. Higgins a number of questions, including, "was there anything in my demeanor that was rude or abusive to Stacy Forsee or Chuck Hanmore?", "Was I at all rude to Stacy Forsee," "Did I ever tell her she had to agree to certain visitation rights? Did I ever order visitation every other weekend?" (Tr 636–37.) Judge Redwine then stated he was "going to show you a document, we are going to call that Court's Exhibit 1" which was the proposed agreed entry for the paternity action, and Judge Redwine ordered that it be admitted into evidence. (Tr 637.) Harrison's attorney, Mr. Swain, asked, "Mrs. Higgins, who called you as a witness?" To which Judge Redwine responded, "I called her as a witness, Mr. Swain. I established that when she got on the stand. Any other questions." (Tr 637.)

● Judge Redwine then asked, "Mrs. McFadin Higgins, do you know of any reason why Stacy Forsee would have been upset with me at all?" and "Was she upset with me at all?" and "Do you know of any reason why Mr. Hanmore should have been upset with me?" and "Was he upset with me?" (Tr 657.) Judge Redwine also asked Higgins, "in Gloria Forsee's statement, Defendant's Exhibit 7, page 21, she allegedly said, 'He,' meaning me, 'was very rude to Stacy. I mean Stacy had never met him or anything and he told Stacy, he said, Ms. Forsee, if you have a problem with that, talking about visitation, you come see me. And, well even Stacy's lawyer that represented her couldn't believe that he, Chief Rose, says, who was that, Ms. Forsee says it was a woman from, it was State appointed, I'm not sure who it was. But, anyway, Stacy said she was really upset that Judge Redwine had given Chuck all of these privileges.' Now did you in anyway indicate that you were dissatisfied with the proceeding?" (Tr 659.) Judge Redwine then asked Ms. Higgins, "Do you have any information from any source that I would have any prejudice for or against Mr. Harrison or for or against Stacy Forsee or any member of her family?" (Tr 660–661.)

● Although Judge Redwine was told by prosecutor Kimberly Mohr that Gloria Forsee was a witness and that she was excluded because of an order for the separation of witnesses, Judge Redwine asked that Gloria and John Forsee be brought in, as well as Mr. Hanmore. (Tr 629–630.) In discussing Stacy Forsee, Gloria Forsee stated in her deposition that, "She went out to Roger Greathouse's place and she said Congressman Deckard, Vandeveer, who was the Mayor at the time and a banker and Judge Redwine were out there and Roger had

just got a shipment of drugs in a semi from Florida and that they had them on a pool table, every kind you could imagine spread out." On direct examination, Gloria stated regarding Stacy that, "Whether it's true or not, I'm not saying but, she believed it. . . . That's what she told me. She told me the names but, she had never met any of these men, she had never seen any of them and this was before she ever came to Court because she hadn't had Jordan at the time and she had no way of knowing any of these names unless they were told to her by someone else. But she believed it, she told me that. She believed this information was true. . . . She thought it was true, but, like I said she didn't know any of these gentlemen, personally, had never met them. As far as I know had never seen them and the only way she could know any names or anything is if somebody had told her." (Tr 669-70.)

• Gloria Forsee also testified that Stacy had told her that she had gone to the FBI because she felt John Forsee wouldn't get a fair trial because she really believed that Judge Redwine had something to do with this. This was mentioned to Gloria Forsee even before Stacy's son Jordan was born. (Tr 670.) Stacy said that she told the FBI about Chuck Hanmore and Roger Greathouse. (Tr 671). Judge Redwine also asked Gloria Forsee, "Do you have any reason to believe I would not be fair in this case, to both sides?" (Tr 689.) Judge Redwine stated, "To set the record straight I do know Mr. Greathouse. I have known him for years. The fact is I've, in this county, my guess is there are thousands of people I know. But, I have never been to Mr. Greathouse's house. I have never been to a place where there was cocaine." (Tr 695.) The State called Chuck Hanmore to testify at the hearing on the motion for change of judge. Hanmore denied taking Stacy For-see to a party at Greathouse's property, testified that Stacy had been to that property on only one occasion, when she came to pick Hanmore up, denied having any conversations with her concerning public officials being on Greathouse's property, and denied telling Stacy that he set fire to a house on Greathouse's property. Hanmore also testified that he did not know if Stacy was present when the fire was set, denied having ever told police that the named public officials were involved in drug activity, and denied having committed arson on Greathouse's property. (Tr 699–702.)

Greathouse testified at the hearing on Harrison's motion for change of judge. Judge Redwine had tried to contact Greathouse at his parent's house on September 16 when the motion for change of judge was filed. In response to that call, Greathouse called Judge Redwine's court and spoke to Judge Redwine, with a court reporter recording the conversation. (Tr 721.)

In that conversation, Judge Redwine identified the allegations set forth in the motion for change of judge, including the allegation that in the summer of 1988, that Judge Redwine was at Greathouse's home when there were packages of cocaine and other drugs on a table in plain view, that Judge Redwine was there and knew all about it, and that a large truckload of drugs was being unloaded at Greathouse's property. (PCR 1658–1664.)

Greathouse appeared at the hearing, and testified that he was at the hearing without a subpoena and had been asked by Judge Redwine to attend. (Tr 719–720.) Regarding this same proceeding at the hearing on Harrison's petition for post-conviction relief, Greathouse testified that Judge Redwine called and that the first thing Greathouse asked Judge Redwine was whether he needed to bring an attorney

and Judge Redwine told him no. (PCR 3027.) However, the transcript of the recorded conversation does not include dialogue between Judge Redwine and Greathouse as to whether Greathouse should bring an attorney. (PCR 1657–1664). Judge Redwine did not disclose at the hearing on the motion for change of judge that he and Greathouse had a substantive conversation regarding the matter prior to Greathouse's appearance at the hearing or that Judge Redwine had informed Greathouse that he did not need to bring an attorney.

Greathouse testified that he and Judge Redwine had known each other for about 20 years, and that when Judge Redwine was a lawyer in private practice he or his law partner had represented Greathouse in a legal dispute, that they had never been anywhere together socially, that he was acquainted with both Joe "Tattoo" and Chuck Hanmore, and that he had never known Judge Redwine to have anything to do with drugs. (Tr 715–724).

It was thus evident throughout the hearing on the motion for change of judge that Harrison's attorneys were going to present a defense based on evidence that there were people other than Harrison of whom Stacy Forsee was in fear, that Chuck Hanmore and Roger Greathouse were among these other people, that the basis of this theory consisted of Stacy Forsee's knowledge of illicit drugs at the Greathouse property, and that Judge Redwine's name would come up in the course of this evidentiary presentation. Knowing that the trial court would have to rule on the admissibility of this evidence, Harrison had sought a change of judge. Harrison's attorneys characterized Judge Redwine's presiding over this trial as being "in the nature of a conflict.".

Judge Redwine stated to defense counsel, "I haven't heard any evidence so far that (Forsee) alleged I did anything to her except give visitation rights to the father of the child. And I haven't heard any evidence at all that she said that I am prejudice [sic] against her, prejudiced against her family, that she was afraid of me for any reason." (Tr 604–605). Judge Redwine also asked defense counsel at the change of judge hearing, "But you are not alleging I had any motive, or opportunity to kill her" to which counsel responded, "No, sir." (Tr 606).

Judge Redwine once again stated, "Well, I want you to know that I've never been to Mr. Greathouse's house. I have known Mr. Greathouse and his family for years. I've dealt with them in Court and I've seen them out of Court, not socially. But, I know who he is and have known. I've never been to his house, I've never been to anyone's house where there is a truckload of drugs or cocaine or a bunch of men dividing up drugs or anything else and as far as I know I was never in your daughter's presence other than at this paternity hearing." (Tr 696). At the hearing on Harrison's petition for post-conviction relief, and referring to Harrison's September 16, 1991, motion for change of judge, Judge Redwine explained that the basis for the change of judge motion "certainly embarrasses me." (PCR 1664), and "Well, I just didn't know what else to do, you know. I care a lot about what people think, and I don't like people saying these things" as the reason explaining why he called Greathouse. (PCR 1664).

At the conclusion of the evidence on the motion for change of judge, Judge Redwine explained that the saw no connection or relevance between any of Harrison's evidence and his own position as trial judge. He therefore denied the motion for change of judge. (Tr 737).

*2. Other pre-trial proceedings.* The record reflects a series of rulings made during the pretrial stage between the deni-

al of Harrison's motion for change of judge and the trial itself which Harrison argues constitute affirmative steps which hampered the defense's trial preparation.

- Judge Redwine moved Harrison's trial date up two months to November 6, 1991. (Tr 290).
- Judge Redwine refused to grant a continuance, despite the State's delayed disclosure of inculpatory DNA evidence. (Tr 975.) Judge Redwine stated that if these were the tests that the defense wanted taken, that the court had on the record that both sides wanted these tests taken and wanted witnesses brought to trial. Judge Redwine denied the defense's motion *in limine* as to a portion of the State's test results. The first time defense counsel had a hard copy of the DNA report from Genescreen was 5:17 p.m. on November 8, 1991. Defense counsel then wanted an opportunity to depose the Genescreen witnesses before they testified. Judge Redwine stated that there was no way to get these individuals deposed and that they would testify that day. Judge Redwine gave defense counsel an opportunity to speak to the witnesses beforehand, but defense counsel did not think that a one or two hour meeting with the witnesses would cover everything when the State had the opportunity throughout the process to speak with those witnesses. (Tr 2117–2124.) The court granted the State's request to amend its witness list on November 4, 1991, to add the two witnesses from Genescreen. (Tr 954–55.) At a pre-trial hearing before it was learned that the State's new DNA evidence was inculpatory, however, Judge Redwine had told defense counsel that if they did not want evidence about future DNA tests it would be excluded because it was past the cutoff date for the filing of witness lists. (Tr 931.)
- Judge Redwine held a hearing (with defense counsel on the phone) on the State's motion *in limine* and granted it even though defense counsel indicated that they were still reading the cases cited by the State. Through this ruling, Judge Redwine ordered defense counsel not to mention directly or by inference in the presence of the panel, the jury panel, that they were alleging that anyone else could have or may have been a suspect in the case without first seeking permission of the court outside the presence of the jury. (Tr 953–959).
- Judge Redwine ruled that the notice of intent to file alibi or to prove alibi was untimely filed, that the theory of the defense was not guilty, that Harrison had more than ample opportunity to assert an alibi defense, and that he was specifically asked and did not indicate any alibi defense. Defense attorneys were instructed not to mention that Harrison was somewhere else at the time of the alleged offense and not to mention any witnesses that will say that he was somewhere else other than at the scene of the crime at the time of the alleged offense, without first seeking the permission of the court outside the presence of the jury. (Tr 971–972).
- Judge Redwine entered an order that excluded defense witnesses disclosed after October 1, 1991. (Tr 62). This date was just five calendar days after his ruling on Harrison's motion for change of judge. The defense witness list included the names of Roger Greathouse, Charles Hanmore, and Joe "Tattoo." (Docket entry 43).
- Thomas Swain stated on direct examination in the post-conviction hearing that Judge Redwine ordered certain death penalty defense seminar materials be given by the defense to the prosecution, and Swain therefore secured a set for the prosecution and a set for the defense. (PCR 1597–1602.) Kim Rhoades (formerly Kim Mohr) testified

at the post-conviction that she reviewed either tapes or seminar materials from the Indiana Public Defender Council. She stated that Judge Redwine gave them to her and told her to review them. Rhoades admits that she did not reciprocate by giving the defense any seminar materials from any prosecutorial seminars on capital cases-that she did not really go to any seminars except for one and she was not asked to give materials to the defense. (PCR 3673–74.)

• Swain stated on direct examination in the post-conviction action that he was appointed by the court to represent Harrison and at that time he was receiving other appointments from the Posey Circuit Court, but that he had not received any appointments from the court since Harrison's case. (PCR 1593.)

*3. Attorney Fees.* After the trial, Judge Redwine refused to compensate defense counsel for their work on the change of judge motion or the mandamus action which followed. After withholding an award of fees, Judge Redwine was inquired of by the Indiana Public Defender Commission. Judge Redwine issued a response on October 2, 1992, almost 10 months after Harrison was sentenced to death.

In a letter to Meg Babcock, staff attorney with the Indiana Public Defender Commission, in which Judge Redwine explained why he had denied certain attorney fee claims, the letter stated, in part, that he considered:

(1) the docket sheet which includes the order book entry of September 24, 1991, in which the Court determined that the attorney had made false, irrelevant, immaterial and meritless allegations with a reckless disregard for their falsity and without any viable theory of their probative value whether true or false;

(2) a certified transcript of the hearing on the Motion for Change of Judge with certain portions highlighted and noted;

(3) a copy of the docket sheets of the paternity matter and criminal matter referred to in the transcript on the Motion for Change of Judge;

(4) a copy of the Motion for Change of Judge, and a copy of the State's response to the Motion for Change of Judge and Affidavit in support of State's Response;

(5) a copy of the letter sent to Thomas M. Swain from the Indiana Public Defender Council;

(6) a copy of the petition for writ of mandamus;

(7) a copy of the Supreme Court's unanimous denial of the petition;

(8) a copy of the news article dated Friday, November 1, 1991, that was in *The Evansville Courier;*

(9) a copy of the Defense's Motion for Continuance filed on November 4, 1991, a copy of the defendant's notice of alibi filed the same date, and a copy of the defendant's motion to dismiss the amended complaint filed on the same date;

(10) copies of the claims which were paid and denied along with an explanation; and

(11) a copy of Posey County's Brief in support of 12(B) motions filed in *Thomas M. Swain v. Board of County Commissioners, et al.*

Judge Redwine stated in this written response to the Commission that the court approved all claims filed by Harrison's attorneys both before, during and after the motion for change of judge, except for those relating to the petition for a writ of mandamus, because "the defense attorneys were not acting in the best interest of Mr. Harrison when they spent from October 4,

1991 up through October 31, 1991, on what the trial court and the Indiana Supreme Court found to be meritless matters when this complicated capital case was to start to trial on November 4, 1991."

Judge Redwine cited canons of ethics which he claims the defense attorneys violated by their actions and states that the defense attorneys were:

in direct criminal contempt of court for advocating this completely false and meritless action for the sole purpose of delaying this trial. Neither of the attorneys ever alleged that I was prejudiced for or against anyone involved in this cause. Neither of them, either before me or the Supreme Court, could hypothesize any reasonable theory as to why these totem pole hearsay statements from a decedent had any possibility of being admissible at trial. Neither attorney believed that there was any factual basis to these ludicrous allegations ... Neither attorney made any attempt whatsoever to either substantiate or to investigate this matter and, in fact, both admitted the unfortunate victim had never stated that she was afraid of me or had any reason to be afraid of me, or that I had any involvement whatsoever in the matters involved in this case [in spite of their sworn allegations in their Petition for Writ of Mandamus that I had "a personal interest in their case (the Murder case)—a legitimate but still a personal interest."]

Judge Redwine also stated that, "it would certainly be unjust if a Judge who voluntarily ... met the suggested guidelines of the Commission should have his county penalized because of the actions of the defense attorneys." (PCR 3864–66).

*4. Other Specifications of Judicial Bias.* Certain of Harrison's specifications of judicial bias refer to matters wholly within the proper management of the pro-

ceedings, and hence are not supportive of his claim of bias.

● Harrison argues that Judge Redwine expressed a "preference" that Harrison's lawyers not present evidence at Harrison's capital sentencing hearing. However, this is a misstatement of the record. Judge Redwine actually stated, "I will allow anything into evidence. I would prefer you not bring witnesses if you can get it in without them, to save time. I am more likely to be able to synthesize it by reading it than by hearing it anyway, so the sooner I get it in writing, the better off I will be as far as making a decision. But yes, as far as I am concerned, there are very few rules of evidence, you know, what we are trying to do is reach a conclusion." (Tr 2547–48).

● As to Harrison's specification that Judge Redwine indicated at judicial sentencing that one of the issues was whether Harrison committed the offenses Judge Redwine stated, "I don't remember any other suspects ... in the offense. Maybe, of course, you will have an opportunity to say whatever you like. I don't recall that, Mr. Swain. If that is true, you can point that out." (Tr 2817.)

● Kimberley Mohr signed an affidavit that stated, "On July 31, 1991, your affiant along with Attorneys Swain and Warrum held a conference with Judge Redwine and discussed the issue of Judge Redwine's name being brought up at trial in conjunction with drug information from Stacy. At that time, Judge Redwine indicated he would not withdraw from the case." (Writ of Mandamus, at 33 ¶ 8.) There is no indication from the record, and there was no finding of fact from the Indiana state courts, that at the time of the July 31, 1991, conference, Judge Redwine was aware that Stacy Forsee's report to the ISP was relevant to Harrison's case.

■ *5. Evaluation of the Record.* This is a case in which actual bias has been demonstrated not by judicial rulings, but by Judge Redwine's personal participation in the development of the proceedings beginning on September 26, 1991. Apart from his rulings, Judge Redwine's statements and actions preceding trial, at the change of judge hearing, during trial and in the letter denying certain attorneys fees, illustrate an unmistakable bias infecting James Harrison's trial and depriving him of a fair trial. Judge Redwine revealed a personal interest in protecting his name and the judiciary in Posey County, an interest he specifically admitted. Apparently, because of that interest, he denied Harrison's motion for change of judge, and thereafter made rulings calculated to remove any mention or implication of his role in Harrison's defense. As to that defense, as it was explained in the context of the motion for change of judge, Judge Redwine's refusal to acknowledge the relevance and the probative value of the information pertaining to the possible motives of others to kill Stacy Forsee persisted, despite "repeated and lucid attempts by [Harrison's] lawyer to dispel it." *United States v. Santos,* 201 F.3d 953, 962 (7th Cir.2000).[7] When the allegations supporting the change of judge request are viewed from Judge Redwine's perspective, "[n]o one so cruelly slandered is likely to maintain calm detachment necessary for fair adjudication." *Mayberry v. Pennsylvania,* 400 U.S. 455, 465, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971). Harrison is correct in

7. The ruling granting the State's motion *in limine* gutted the defense, especially in light of its timing. Though the effect of evidence supporting Harrison's contention that others were responsible for the deaths cannot be known on the present record, he clearly had a right to present evidence of a plausible alternative to the State's version of the case. *United States v. Beard,* 354 F.3d 691 (7th Cir.2004) ("realistically, a jury called upon to decide guilt must compare the prosecution's version of the incident giving rise to the case with the defense version .... Confidence in a proposition, such as Beard's guilt, is created by excluding alternatives and undermined by presenting plausible alternatives.... That is why the duty of a criminal defendant's lawyer to investigate is not satisfied just by looking for ways of poking holes in the government's case. There must also be a reasonable search for evidence that would support an alternative theory of the case.") (internal quotations and citations omitted). The holding in *Beard* concerning the nature of plausible theories of defense coupled with the significance of a defendant's lawyer's duty to investigate plausible alternatives to the State's case, meld into the constitutional right to present evidence of a defense. The scope of that right was recently explained in these terms:

> It is clear that the defendant's right to present evidence is not absolute, and that the State may place reasonable limitations on the introduction of evidence in criminal proceedings. However, the unavoidable conclusion to be drawn from the Supreme Court's cases is that the "the right to present ... witnesses to establish a defense" is clearly established as "a fundamental element of due process of law." State evidence rules must yield to this fundamental right when they "plainly interfere[] with [the defendant's] right to defend against the State's charges," particularly when such rules are "disproportionate to the purposes they are designed to serve." A state court's interpretation of its evidence rules that results in the denial of the defendant's right to present a defense, most notably the defense of third-party culpability as in Chambers, especially when the state court interprets the evidence rules incorrectly, is an unreasonable application of this clearly established constitutional rule. See *Wade v. Mantello,* 333 F.3d 51, 58 (2d Cir.2003) (holding that a claim that evidence of another's guilt was improperly excluded "is based upon clearly established federal law, as determined by the Supreme Court. The Constitution protects a criminal defendant from the arbitrary exclusion of material evidence, and evidence establishing third-party culpability is material.").

*Wynne v. Renico,* 279 F.Supp.2d 866, 882 (E.D.Mich.2003) (some internal citations omitted).

arguing that this record leaves one "with an abiding impression that the trial judge permitted himself to become personally embroiled" with the issues. *Ungar v. Sarafite*, 376 U.S. 575, 585, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964); *see also McGreal v. Ostrov*, 227 F.Supp.2d 939, 952 (N.D.Ill. 2002) ("To accuse a prosecutor or judge of such depravity is a serious charge indeed, one that undermines public confidence, and casts an unfair shadow over those that are wrongly accused.")

The Supreme Court's death penalty jurisprudence includes the recognition that "death is different," *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), and that difference creates a unique "need for reliability on the determination that death is the appropriate punishment in a specific case." *Zant v. Stephens*, 462 U.S. 862, 884–85, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (quoting *Woodson*, 428 U.S. at 305, 96 S.Ct. 2978). The role of federal habeas review, though limited, must be correspondingly careful, for "Congress has recognized that federal habeas corpus has a particularly important role to play in promoting fundamental fairness in the imposition of the death penalty." *McFarland v. Scott*, 512 U.S. 849, 859, 114 S.Ct. 2568, 129 L.Ed.2d 666 (1994). As the foregoing demonstrates, we are firmly of the view that in remaining on the case as the presiding judge, Judge Redwine deprived Harrison of the fair trial which the Constitution requires. As stated in *United States v. Harbin*, 250 F.3d 532, 543 (7th Cir.2001), "harmless error does not apply to claims of judicial bias, ever."

### IV. HARRISON'S REMAINING CLAIMS

The point has been made here that structural error occurred and that such error is reversible *per se* "because the error either is serious yet its effect on the outcome of a particular case difficult to establish . . . or infringes a right unrelated or only distantly related to the interest in making sure (so far as possible) that innocent people aren't convicted." *Santos*, 201 F.3d at 959–60.

The errors impacting "structural" rights require automatic reversal because they impact the very foundation of a fair trial. The rule of automatic reversal is thus essentially a categorical application of the harmless error standard. Errors such as complete denial of counsel, a biased judge, the denial of self-representation, etc., "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for the determination of guilt or innocence . . . and no criminal punishment may be regarded as fundamentally fair,'" *Neder*, 527 U.S. at 8–9, 119 S.Ct. 1827 [citation omitted], thus necessarily adversely impacting the dual interests identified above.

*Harbin*, 250 F.3d at 543–44. When structural error has been found, other issues "wash out." *Santos*, 201 F.3d at 961. With relief being required on the basis of judicial bias, other claims—which in this instance amount at most to trial error—need not be and thus are not addressed, in this ruling.

### V. CONCLUSION

"The Constitution entitles a criminal defendant to a fair trial, not a perfect one." *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). It is our firm conclusion that Harrison received neither. Harrison has mustered concrete facts and evidence to support his claim of constitutional deprivations sufficient to rebut the presumption that Judge Redwine was impartial. *See Bracy*, 520 U.S. at 909, 117 S.Ct. 1793; *Aleman*, 138 F.3d at 307. As was noted by the Supreme Court fifty years ago:

Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome.

*In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). The nature of the error infecting Harrison's trial was structural, making it impervious to harmless error review. See *Arizona v. Fulminante,* 499 U.S. 279, 310–11, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991); *Maurino v. Johnson,* 210 F.3d 638, 644 (6th Cir.2000) (explaining that judicial bias "is a structural error" that, if found on habeas, "requires automatic reversal"). Accordingly, Harrison's petition must be granted.

Any grant of habeas relief is no small matter. When premised on a finding of judicial bias, it is an especially sobering matter. Given the unequivocal directives of the Supreme Court where judicial bias results in structural error permeating the entire trial process, we have no alternative but to order a new trial. Harrison's habeas petition is **GRANTED.** The State of Indiana shall set a new trial date within sixty (60) days of the date of this Entry at which time the State can retry its case against Harrison before an impartial judge. If the state chooses not to retry Harrison, it must forthwith release him from custody by which he is detained pursuant to the Judgment on the Posey Circuit Court in No. 65C01–9104–CF–0008.

Judgment consistent with this Entry shall now issue.

**IT IS SO ORDERED.**

### FINAL JUDGMENT AND WRIT OF HABEAS CORPUS

The court, having this day entered its ruling granting the petition for a writ of habeas corpus,

**IT IS NOW THEREFORE ADJUDGED** that James P. Harrison's petition for a writ of habeas corpus is **granted.** The State of Indiana shall release Harrison from any and all further confinement as a result of proceedings in the Posey Circuit Court, styled *State of Indiana v. James P. Harrison,* No. 65C01–9104–CF–0008, within sixty (60) days unless within that time a new trial is set before an impartial judge.