In the

# United States Court of Appeals

### For the Seventh Circuit

---

No. 04-1398

JAMES P. HARRISON,

*Petitioner-Appellee*,

*v.*

DANIEL R. MCBRIDE,
Superintendent,

*Respondent-Appellant*.

---

Appeal from the United States District Court
for the Southern District of Indiana,
Indianapolis Division.
No. 99 C 933—**Sarah Evans Barker**, *Judge.*

---

ARGUED MAY 5, 2005—DECIDED OCTOBER 27, 2005

---

Before FLAUM, *Chief Judge*, and RIPPLE and WILLIAMS, *Circuit Judges*.

RIPPLE, *Circuit Judge*. James Harrison was convicted of the murders of Stacy Forsee and her two children. He was sentenced to death. After exhausting his state remedies in the courts of Indiana, he petitioned for a writ of habeas corpus in the district court. *See* 28 U.S.C. § 2254(a). The court granted the writ. The State of Indiana appeals that decision.

*See* 28 U.S.C. § 1291. We now affirm the judgment of the district court for the reasons set forth in the following opinion.

# I

# BACKGROUND

## A. Facts

A complete recitation of the facts of this case and of the rulings that led to Mr. Harrison's habeas petition are set forth in the district court's very thorough opinion. *See Harrison v. Anderson*, 300 F. Supp. 2d 690 (S.D. Ind. 2004). We recount here only those matters pertinent to the issue raised on appeal.

On January 17, 1989, the bodies of 20-year old Stacy Forsee, and her children Tia (3 1/2 years) and Jordan (21 months) were found among the ruins of the family's charred home. Forsee had been stabbed; the children had died as a result of the fire. After an investigation that lasted more than two years, Mr. Harrison was charged with arson, with the knowing murders of Stacy and Tia, and with the felony murder of Jordan.

Charges against Mr. Harrison were filed in Posey Circuit Court. Counsel was appointed for Mr. Harrison, and trial was set for January 6, 1992, before Judge James Redwine.

### 1. Change-of-Judge Motion

During the course of preparations for Mr. Harrison's trial, defense counsel learned through depositions that, not long before Forsee was killed, she had told officers of the Indiana State Police ("ISP") that she feared for her life. More specifi-

cally, she told Detectives Gary Gilbert and Larry Rhoades that she was being followed by a man in a suspicious van, that she had information about drug activity in Posey County involving her ex-boyfriend, Charles Hanmore, and another individual, Roger Greathouse, and that Judge Redwine had been present at Greathouse's home when drugs were being unloaded on Greathouse's property. Based upon this information, one defense theory was that members of the local drug community, rather than Mr. Harrison, had targeted Forsee because of her knowledge of drug activity.

In July of 1991, Judge Redwine was informed by the parties that his name had been mentioned "in conjunction with drug information" that Forsee had provided to the ISP. Judge Redwine indicated that he would not withdraw from the case.[1] Subsequently, on September 16, 1991, the defense moved for a change of venue from the judge. The motion alleged, among other matters, that Judge Redwine could not rule objectively on the admissibility of evidence pertaining to Forsee's fear of Greathouse because of the possibility that the Judge's name might be mentioned during the presentation of the evidence.

On the same day that the motion for a change of judge was filed, Judge Redwine telephoned Greathouse and shared with him the allegations in the motion. The Judge requested that Greathouse attend the scheduled hearing on that motion. *See* State Ct. Vol. 23 at 721.

---

[1] In August, Judge Redwine granted the prosecution's oral request, over Mr. Harrison's objections, to advance his trial by two months.

The following evidence was presented during the hearing. Detective Rhoades testified that, in 1988, Forsee had reported to the police that Judge Redwine was a person who was aware of drug activity. A tape recording of this interview had been made, but subsequently had been misplaced. Detective Rhoades also testified that he could not investigate allegations involving public officials without first securing approval from the Superintendent of the ISP. Additionally, Detective Rhoades stated that someone recently had made a request to conduct an investigation. *Id.* at 561-63. Prior to dismissing Detective Rhoades as a witness, Judge Redwine engaged in the following colloquy:

| The Court: | To your knowledge, has [Forsee] ever told anyone that I was at a party at Roger Greathouse's house. |
|---|---|
| Officer Rhoades: | Not to my knowledge. |
| The Court: | To your knowledge, has she ever told anyone that I had any knowledge of drug trafficking in this county. |
| Officer Rhoades: | Just again, as I testified earlier, the information that she said Chuck Hanmore provided her with that you were aware of semi loads of marijuana. |
| The Court: | And do you have any information that would corroborate any of those statements in anyway? |
| Officer Rhoades: | No, I do not. |

. . .

| | |
|---|---|
| The Court: | And at that time did you indicate to them [defense counsel] that Stacy Foresee [sic] had told you that I was at some party where drugs were? |
| Officer Rhoades: | No, I did not. |
| The Court: | You have never told anyone that she told you that? |
| Officer Rhoades: | No. |
| The Court: | And she did not tell you that? |
| Officer Rhoades: | No, she did not. |
| The Court: | Do you have any reason at all to believe I was at a party where drugs were? |
| Officer Rhoades: | No, I don't. |

*Id.* at 568-70.

Detective Gilbert, also of the ISP, was present during the interview with Stacy Forsee and testified at the change-of-judge hearing. During Detective Gilbert's testimony, Judge Redwine again interjected clarifications and questions into the examination:

| | |
|---|---|
| Defense Counsel: | And in that interview did she tell you she had been to the FBI? |
| Officer Gilbert: | It is my understanding that she did, or the FBI was mentioned some time during that interview. |
| Defense Counsel: | And did she mention to you that after she had gone to the FBI this van had started following her? |
| The Court: | She didn't say she had gone to the FBI. The officer said that she had |

just said that, or it was mentioned
in the interview. Please make your
questions specific. This is a very
important matter, Mr. Warrum. I
don't want you confusing the facts.

*Id.* at 575. Two pages later in the transcript, Judge Redwine
stated: "She has not said, the witness has not said that she
went to the FBI. The witness said he doesn't know for sure
if she had been or said she was going." *Id.* at 577-78.

Judge Redwine took an active role in other aspects of the
hearing as well. Judge Redwine admitted from the bench
that the allegations contained in the motion "reflect[] upon
the credibility of this Court," and he reproved defense
counsel for "act[ing] so irresponsibly" by not investigating
the allegations more thoroughly. *Id.* at 610-12. He took
judicial notice of records from a criminal case involving
Forsee's brother, over which he had presided, to establish
that a factual basis supported the guilty plea. *Id.* at 627-28.
He ordered records in Forsee's son's paternity action to be
made public and played the tape of the paternity hearing to
show that he had not been biased against Forsee. *Id.* at 628-
29. Additionally, Judge Redwine called Forsee's attorney
(Ms. McFaddin-Higgins) in the paternity action as a witness
to establish that the proceeding had been fair. *Id.* at 636-37,
657, 659. Judge Redwine had Forsee's mother, brother and
former boyfriend (Charles Hanmore) sit in the courtroom
and listen to McFaddin-Higgins' testimony, despite a
witness separation order. *Id.* at 629-30. He called Greathouse
as a witness to testify that he had never known the Judge to
be involved in drug activity. *Id.* at 715-24. Finally, Judge
Redwine asked defense counsel if they were alleging that he
had any motive to or did kill Forsee. *Id.* at 604-06. He stated
to defense counsel: "These are serious allegations reflecting

on the credibility of the court. . . . You have brought a lot of people's names up and dragged them through the mud. You have probably ruined a lot of people's lives and reputations . . . . " *Id.* at 610. Judge Redwine ultimately denied the change-of-judge motion.

After Judge Redwine denied that request, Mr. Harrison filed a mandamus action in the Supreme Court of Indiana to compel a change of judge; Mr. Harrison filed a brief in support of that motion, the transcript of the hearing on the change-of-judge motion, and other record materials in support of his action. *See* R.34, Ex.A; State Ct. Vols. 34 & 35. The Supreme Court of Indiana denied relief without opinion.

### 2. Other Rulings by the State Court

The expanded record also reflects a series of pre-trial rulings that followed the denial of the change-of-judge motion. According to Mr. Harrison, these rulings evidence Judge Redwine's efforts to hinder the defense. They included: (1) refusing to grant the defense a continuance to respond to the State's late disclosure of inculpatory DNA test results; (2) granting the State's motion in limine—even though defense counsel indicated that he was not ready to respond—to prohibit defense counsel from making any allegation that a third party had killed Forsee; (3) excluding defense witnesses disclosed after the deadline, including Hanmore and Greathouse; and (4) requiring defense counsel to share with the prosecutor materials that defense counsel had obtained from a death penalty defense conference, while not imposing a similar requirement on the prosecutor. *See Harrison*, 300 F. Supp. 2d at 710-12.

Mr. Harrison's murder trial began on November 6, 1991. There was evidence admitted that, before the fire trucks

arrived, Harrison had been observed near the scene of the fire on the night of the murders. There also was evidence that he had purchased kerosene days before the murders and that a flammable liquid had started the fire. Finally, evidence was presented that Mr. Harrison had informed fellow inmates in a Maryland jail that he had committed the crimes. The jury acquitted Mr. Harrison of Forsee's murder, but found him guilty of the remaining counts. The jury then recommended that Mr. Harrison be sentenced to death for the murders of both of Forsee's children. The trial court imposed the death sentence for both counts. After trial, Judge Redwine refused to compensate defense counsel for their work on the change-of-judge motion and on the mandamus action. He characterized these filings as a "completely false and meritless action for the sole purpose of delaying this trial." *Id*. at 712. Finally, defense counsel's regular appointments from the Posey Circuit Court ended after Mr. Harrison's trial. *Id*.

The convictions were affirmed on direct appeal to the Supreme Court of Indiana, *see Harrison v. State*, 644 N.E.2d 1243 (Ind. 1995); however, the Supreme Court of Indiana remanded to the trial court for the preparation of a capital sentencing order. The trial court complied with the remand, and the imposition of the death sentence was affirmed by the state supreme court. *See Harrison v. State*, 659 N.E.2d 480 (Ind. 1995). The state trial court subsequently denied Mr. Harrison's petition for state post-conviction relief; the Supreme Court of Indiana affirmed the denial of relief. *See Harrison v. State*, 707 N.E.2d 767 (Ind. 1999).

## B.  District Court Proceedings

Mr. Harrison's federal habeas petition raises eleven

claims; the district court addressed only his judicial bias claim. *Id*. at 696. That claim essentially alleged:

> [T]he circumstances surrounding Judge Redwine's involvement in the trial of this matter create[d] a constitutionally intolerable risk of judicial bias such that the likelihood of bias or its appearance is so substantial as to create a conclusive presumption of actual bias. He also assert[ed] that Judge Redwine was actually biased against him and his lawyers.

R.23 at 52. In reply, the Government contended that Mr. Harrison had defaulted procedurally on the judicial bias claim for two reasons: (1) he had not presented fairly this contention to the state courts; and (2) the Supreme Court of Indiana adjudicated the claim on an independent and adequate state procedural ground. The district court rejected both contentions. It first held that Mr. Harrison had fairly presented the claim:

> The due process argument was explicitly presented in Harrison's mandamus petition to the Indiana Supreme Court at the outset of his prosecution. The argument was renewed in Harrison's direct appeal. The Indiana Supreme Court acknowledged that Harrison was seeking relief based on his claim that he was denied a fair and impartial trial because of the denial of his motion for a change of venue from the judge. The Indiana Supreme Court concluded Harrison "state(d) no facts in his brief . . . , nor can we find any in the record, that indicate that there was an undisputed claim of prejudice or that the trial court expressed an opinion on the merits of the controversy." *Harrison v. State*, 644 N.E.2d 1243, 1249 (Ind. 1995). Whether correct in that assessment of the claim, the Indiana Supreme Court clearly recognized Harrison's claim of judicial bias

precisely as it has been reasserted here.

*Harrison*, 300 F. Supp. 2d at 699-700 (emphasis in original).

Secondly, the district court held that the Supreme Court of Indiana did not adjudicate the judicial bias claim on an independent and adequate state ground:

> No procedural rule was cited by the Indiana Supreme Court either in its Order denying Harrison's mandamus petition or in Harrison's direct appeal on this point. Our interpretation of the Indiana Supreme Court action in rejecting the claim in Harrison's direct appeal was simply to explain that it had found no *facts establishing* Harrison's claim of prejudice. This was a decision on the merits of the claim as the Indiana Supreme Court perceived it; it was not a decision based on a failure to comply with some procedural requirement of state law.

*Id*. at 700 (emphasis in original).

The district court then proceeded to the merits of the judicial bias claim. It determined that the Supreme Court of Indiana's treatment of the judicial bias claim in both the mandamus action and in Mr. Harrison's direct appeal was not entitled to the level of deference usually afforded state court judgments under 28 U.S.C. § 2254(d)(1). The district court first determined that, because the state supreme court had reviewed Judge Redwine's denial of a change of judge for an abuse of discretion (a state law standard), it had not reached the merits of the federal constitutional claim, despite an opportunity to do so. *Id*. at 701. The district court alternatively held that, even if the Supreme Court of Indiana had decided the federal claim of judicial bias on the merits, § 2254(d) deference did not apply because the state court's decision was "contrary to" the precedent of the Supreme Court of the United States:

Not only did the Indiana Supreme Court fail to articu-
late the proper federal test, but it articulated a
test—abuse of discretion, prejudice to the defen-
dant—wholly incompatible with the nature of structural
error, for which prejudice *is not required*, *Neder* [*v. United
States*, 527 U.S. 1, 14 (1999)] . . . . Where structural error
is implicated, and judicial bias is one of the narrow class
of constitutional violations in which structural error is
implicated, harmless error (the obverse of prejudice, in
the present context) is not an option. *Tyson v. Trigg*, 50
F.3d 436, 442 (7th Cir. 1995). . . .

*Id*. at 702-03 (emphasis in original).[2]

The district court then independently reviewed the
expanded record and held that:

[A]ctual bias has been demonstrated not by judicial
rulings, but by Judge Redwine's personal participation
in the development of the proceedings beginning on
September 26, 1991. Apart from his rulings, Judge
Redwine's statements and actions preceding trial, at the
change of judge hearing, during trial and in the letter

---

[2]   The second prong of 28 U.S.C. § 2254(d)(1) provides that a writ
of habeas corpus may not issue unless the state court's adjudica-
tion was an unreasonable application of federal law. The Su-
preme Court has explained that a "state-court decision that
correctly identifies the governing legal rule but applies it
unreasonably to the facts of a particular prisoner's case certainly
would qualify as a decision 'involv[ing] an unreasonable
application of . . . clearly established Federal law.' " *Williams v.
Taylor*, 529 U.S. 362, 407-08 (2000) (quoting 28 U.S.C. § 2254(d)(1)).
Accordingly, the district court held that this prong does not apply
in this case, because, at the least, the Supreme Court of Indiana
did not "correctly identif[y] the governing legal rule." *Harrison v.
Anderson*, 300 F. Supp. 2d 690, 703 n.4 (S.D. Ind. 2004).

denying certain attorneys fees, illustrate an unmistakable bias infecting James Harrison's trial and depriving him of a fair trial. Judge Redwine revealed a personal interest in protecting his name and the judiciary in Posey County, an interest he specifically admitted. Apparently, because of that interest, he denied Harrison's motion for change of judge, and thereafter made rulings calculated to remove any mention or implication of his role in Harrison's defense. As to that defense, as it was explained in the context of the motion for change of judge, Judge Redwine's refusal to acknowledge the relevance and the probative value of the information pertaining to the possible motives of others to kill Stacy Forsee persisted, despite "repeated and lucid attempts by [Harrison's] lawyer to dispel it." *United States v. Santos*, 201 F.3d 953, 962 (7th Cir. 2000). When the allegations supporting the change of judge request are viewed from Judge Redwine's perspective, "[n]o one so cruelly slandered is likely to maintain calm detachment necessary for fair adjudication." *Mayberry v. Pennsylvania*, 400 U.S. 455, 465 (1971). Harrison is correct in arguing that this record leaves one "with an abiding impression that the trial judge permitted himself to become personally embroiled" with the issues. *Ungar v. Sarafite*, 376 U.S. 575, 585 (1964).

*Id.* at 714 (citations and parallel citations omitted). The district court accordingly granted habeas relief. The State timely appealed.

## II

## ANALYSIS

## A. Procedural Default

The State first submits that the district court erroneously concluded that Mr. Harrison had presented fairly the issue of judicial bias to the Supreme Court of Indiana during its direct review of the case. As we noted earlier, the district court looked to *Ellsworth v. Levenhagen*, 248 F.3d 634 (7th Cir. 2001), and concluded that the Supreme Court of Indiana "clearly [had] recognized Harrison's claim of judicial bias precisely as it has been reasserted here." *Harrison*, 300 F. Supp. 2d at 700.

### 1. *Baldwin v. Reese*

The State does not address directly any infirmities in the district court's analysis; instead, it maintains that the intervening decision of the Supreme Court of the United States in *Baldwin v. Reese*, 541 U.S. 28 (2004), establishes that "more" is required to preserve a claim for habeas review than we had articulated in *Ellsworth*. The State also argues that Mr. Harrison's brief to the Supreme Court of Indiana does not satisfy *Reese*'s heightened "fair presentment" requirement. Neither of these arguments are persuasive.

In *Ellsworth*, we considered whether the plaintiff properly had presented his Sixth Amendment claim to the state courts prior to seeking habeas relief. We began our analysis by explaining, in general terms, the "fair presentment" requirement:

> "Initially, the state courts must have had a 'fair opportunity' to consider a question of constitutional import before federal collateral review on that question is appropriate." *Kurzawa* [*v. Jordan*, 146 F.3d 435, 441 (7th Cir. 1998)] (citing *Burgin v. Broglin*, 900 F.2d 990, 996

(7th Cir. 1990)). "A 'fair presentment' of a petitioner's claims requires that a petitioner give state courts 'a meaningful opportunity to pass upon the substance of the claims [petitioner] later presses in federal court.'" *Spreitzer v. Schomig*, 219 F.3d 639, 645 (7th Cir. 2000) (quoting *Howard v. O'Sullivan*, 185 F.3d 721, 725 (7th Cir. 1999)). To satisfy that requirement, an inmate must present "both the operative facts and the legal principles that control each claim to the state judiciary." *Wilson v. Briley*, 243 F.3d 325, 327 (7th Cir. 2001).

*Ellsworth*, 248 F.3d at 639. We then set forth the four-part test used to determine "whether a petitioner has fairly presented a claim to the state judiciary":

1) whether the petitioner relied on federal cases that engage in a constitutional analysis; 2) whether the petitioner relied on state cases which apply a constitutional analysis to similar facts; 3) whether the petitioner framed the claim in terms so particular as to call to mind a specific constitutional right; and 4) whether the petitioner alleged a pattern of facts that is well within the mainstream of constitutional litigation.

*Id.* We further explained that, at its core, the task of the habeas court was to "assess[], in concrete, practical terms, whether the state court was sufficiently alerted to the federal constitutional nature of the issue to permit it to resolve that issue on a federal basis." *Id.* (internal quotation marks and citations omitted).

This language closely resembles the introductory language employed by the Supreme Court in *Reese*:

Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, thereby giving the State the opportunity to pass upon and

correct alleged violations of its prisoners' federal rights. To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim.

541 U.S. at 29 (internal quotation marks and citations omitted). After articulating the general parameters of the "fair presentment" requirement, the Court reviewed the nature of petitioner Reese's claims in state court:

In relevant part, the petition [to the state supreme court] asserted that Reese had received ineffective assistance of both trial court and appellate court counsel. The petitioner added that his imprisonment is in violation of [Oregon state law]. It said that his *trial* counsel's conduct violated several provisions of the *Federal* Constitution. But it did not say that his separate *appellate* ineffective assistance claim violated *federal* law.

*Id.* at 29-30 (emphasis in original; internal quotation marks and citations omitted). A federal district court had determined that Reese's failure to fairly present his claims of ineffective assistance of appellate counsel to the state supreme court barred habeas relief.

A divided panel of the Ninth Circuit reversed:

Although the majority [of the Ninth Circuit panel] apparently believed that Reese's petition itself did not alert the Oregon Supreme Court to the federal nature of the appellate "ineffective assistance" claim, it did not find that fact determinative. Rather, it found that Reese had satisfied the "fair presentation" requirement because the justices of the Oregon Supreme Court had had "the *opportunity* to read . . . the lower [Oregon]

court decision claimed to be in error before deciding whether to grant discretionary review." *Had they read the opinion of the lower state trial court*, the majority added, the justices would have, or should have, realized that Reese's claim rested upon federal law.

*Id.* at 30 (quoting *Baldwin v. Reese*, 282 F.3d 1184, 1193-94 (9th Cir. 2002) (emphasis in original)).

The Supreme Court then addressed whether the Ninth Circuit "correctly interpreted the 'fair presentation' requirement." *Id.* The Court began "by assuming that Reese's petition by itself did not properly alert the Oregon Supreme Court to the federal nature of Reese's claim." *Id.* at 30. In other words, the Supreme Court assumed that Reese's petition to the state supreme court did not meet existing standards for "fair presentment"—such as those articulated by this court in *Ellsworth*. The Court then concluded that, based on this assumption, "Reese failed to meet the 'fair presentation' standard, and the Ninth Circuit was wrong to hold the contrary." *Id.* at 30-31. The Court, therefore, did nothing to disturb our understanding of what is necessary to "fairly present" a claim to the state supreme court in a petition for habeas relief.

The Court in *Reese* then went on to explain why the "opportunity" to read the lower state court opinions, which fully laid out Reese's federal constitutional claims, was not a substitute for fairly presenting the federal claim within the petition itself. The Court stated that an

> opportunity means that the judges *could have* read them. But to say that a petitioner "fairly presents" a federal claim when an appellate judge can discover that claim only by reading lower court opinions in the case is to say that those judges *must* read the lower court opinions—for otherwise they would forfeit the State's

> opportunity to decide that federal claim in the first instance. In our view, federal habeas corpus law does not impose such a requirement.

*Id.* at 31 (emphasis in original).

We see little similarity between the procedural situation before the Supreme Court in *Reese* and the one presented here. In *Reese*, the petitioner *never* articulated the federal basis of his claim before the state supreme court. The Supreme Court of Oregon could have discovered that Reese was claiming a federal constitutional violation only by reading the lower state court opinions. Here, by contrast, Mr. Harrison clearly identified the federal basis of his judge-bias claim in his brief on direct appeal to the Supreme Court of Indiana. *See Dye v. Hofbauer*, No. 04-8384, 2005 WL 2494290 (U.S. Oct. 11, 2005) (holding that brief to state supreme court, which identifies the federal basis of a claim, preserves that claim for habeas review). Specifically, among the issues that he identified for the state supreme court, Mr. Harrison stated:

> Issue II - The trial court denied the defense motions for . . . change of judge . . . . The denial of these motions constitute erred [sic] under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 12, 13, 16, 18 and 23 of the Indiana Constitution.

R.34, Ex.B at 12. The federal nature of these claims was reiterated in the argument section of his brief. *See id.* at 16. With respect to the change-of-judge motion itself, Mr. Harrison stated the following in his brief:

> B. MOTION FOR CHANGE OF JUDGE. Defendant filed a motion for change of judge and a hearing was held September 24th, 1991 at which time the trial court

denied the motion. (R. 494 through 915). The Indiana Supreme Court has already heard this issue and denied the motion prior to trial after a hearing in the Supreme Court on October 31st 1991. The issue is now raised for purposes of preserving the same for further appeal.

Harrison would contend he was denied a fair and impartial trial by jury by not having a change of venue from the judge.

*Id.* at 17.

Finally, Mr. Harrison's direct appeal to the Supreme Court of Indiana referenced the mandamus action that he previously had pursued *in that court*—a mandamus action in which the federal constitutional claim had been raised and argued.[3] Specifically, the brief in support of Mr. Harrison's mandamus action stated:

The fundamental principle of due process and due course of law require that the Defendant have a Judge impartial and free of the appearance of impropriety, particularly is this true in a case in which the death

---

[3] At oral argument, the State also argued that the mandamus was an inappropriate procedural mechanism for raising a federal due process claim with respect to judge bias. It provided this court with supplemental authority, *Robinson v. Grant Super. Ct. No. 1*, 471 N.E.2d 302, 303 (Ind. 1984), for the proposition that "[t]he appellate process is adequate to correct any abuse of the respondent court's discretion in denying [a] motion for change of judge." We do not rest our determination that Mr. Harrison fairly presented his claim to the Supreme Court of Indiana only on the basis of the arguments raised in his mandamus petition, and therefore the nature of the mandamus action under Indiana law does not dictate our analysis.

penalty has been requested.

. . .

The Defendant James P. Harrison is entitled to a fair trial with an impartial jury and an impartial judge. <u>The Constitution of Indiana, Article I, Sections 12 and 13, and the Constitution of the United States, Fifth, Sixth and Fourteenth Amendments.</u>

. . .

If the trial court is incorrect in its ruling on the change of judge and this Court finds a denial of rights under the due process or the due course of law clause of the State and Federal Constitutions, all procedural rules that would prevent their consideration or leave them to the discretion of the trial court must yield to the fundamental principle of due process and due course of law.

R.34, Ex.A at 14, 21-22 (emphasis in original).

Thus, the Supreme Court of Indiana did not have to read through all of the lower court opinions to understand that Mr. Harrison was raising a federal claim. The federal nature of the claim was articulated in his brief before the Supreme Court of Indiana, and, in support of that claim, Mr. Harrison explicitly referred the state supreme court to the areas in the record supporting his claim—as well as to prior briefing of the issue in the *Supreme Court of Indiana itself.* These factors clearly distinguish the present situation from *Reese*, and we conclude that *Reese* does not govern the petition presently before us.

### 2. Other Procedural Default Claims

The State makes three other cursory arguments with respect to procedural default. First, the State submits that

"[to] fairly present any claim of judicial bias, Harrison was required to provide argument and authority for his allegation that Judge Redwine was biased *at trial*. His rote reference on direct appeal to his pretrial pleading was temporally incapable of doing so . . . ." Appellant's Br. at 16 (emphasis in original). The State cites no authority for its proposition that federal constitutional claims of judicial bias must be rooted in actions exhibited at trial. Surely prejudice or interest of a judge may become apparent prior to trial and require the removal of that judicial officer in order to satisfy the requirements of due process. *See Anderson v. Sheppard*, 856 F.2d 741, 745 (6th Cir. 1988) ("Bias or prejudice on the part of a judge may exhibit itself prior to the trial by acts or statements on his part." (internal quotation marks and citations omitted)).[4]

The State also contends that, "while the Indiana Supreme Court did not expressly find waiver, its disposition of this claim makes clear that it was based on Harrison's failure to adequately apprise the court of the factual and legal basis for his claim." Appellant's Br. at 15. However, we consis-

---

[4] This statement has another possible interpretation: Although Mr. Harrison fairly presented a claim of judge bias, that claim relied only upon Judge Redwine's actions during the mandamus action; Mr. Harrison, therefore, cannot rely upon subsequent actions of Judge Redwine in establishing a bias claim. Because our substantive decision relies only on those actions taken by Judge Redwine prior to the change-of-judge motion and during the hearing on that motion, we do not have to define with precision which factual allegations—beyond those involving the change-of-judge motion—were fairly presented to the state supreme court. As we later point out, however, the Judge's actions subsequent to the denial of the change-of-judge motion certainly confirm that he had a personal stake in the proceedings.

tently have held that "[a]n adequate and independent state ground bars federal habeas review of constitutional claims only if 'the last state court rendering judgment in the case "clearly and expressly" states that its judgment rests on the state procedural bar.'" *Gomez v. Jaimet*, 350 F.3d 673, 677 (7th Cir. 2003) (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989)). Thus, the State's concession that an express finding of waiver is not present dooms this argument.

Lastly, the State asserts, without lengthy discussion, that our case law requires a petitioner to present both the factual and legal bases of the federal claim in order to meet the "fair presentment" requirement. *See* Appellant's Br. at 17 (citing *Verdin v. O'Leary*, 972 F.2d 1467, 1481 (7th Cir. 1992)). There is no question that "fair presentment" requires that the state court be apprised of the "operative facts" as well as "the *substance* of the federal claim." *Verdin*, 972 F.2d at 1474 (emphasis in original). Mr. Harrison satisfied these requirements. As noted above, the substance of the federal claim—that his trial was presided over by a biased judge and that this bias violated federal constitutional guarantees of due process—was presented in his brief on direct appeal to the Supreme Court of Indiana. Similarly, Mr. Harrison explicitly referred the state supreme court to the specific area of the record that supported his federal claim—a record with which the Supreme Court of Indiana already was familiar by virtue of the mandamus action. Consequently, Mr. Harrison has satisfied the fair presentment requirement.

## B. Judge Bias

### 1. Standard of Review

Mr. Harrison filed his habeas petition after enactment of the Antiterrorism and Effective Death Penalty Act

("AEDPA"), and, therefore, we are bound by AEDPA's restrictions on federal review of state court rulings. Under AEDPA, a writ of habeas corpus may be granted only if Mr. Harrison demonstrates that the state court's adjudication of the claim was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court of the United States, *see* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000), or if the decision was premised on an unreasonable determination of facts, *see* 28 U.S.C. § 2254(d)(2).

This standard, however, applies only to claims which have been adjudicated on the merits. *See Braun v. Powell*, 227 F.3d 908, 916-17 (7th Cir. 2000). In the absence of an adjudication on the merits, we employ the general standard as set forth in 28 U.S.C. § 2243, which requires us to "dispose of the matter as law and justice require." *See Braun*, 227 F.3d at 916-17. Of course, even when the AEDPA standard does not apply—either because the state court's opinion was unreasonable or because the state judiciary did not address the constitutional claim—"[a] prisoner still must establish an entitlement to the relief he seeks." *Aleman v. Sternes*, 320 F.3d 687, 690 (7th Cir. 2003). According to 28 U.S.C. § 2254(a), "a district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

### 2. Characterization of the State-Court Adjudication

With respect to Mr. Harrison's judge bias/due process claim, the Supreme Court of Indiana stated:

> Defendant contends that he was denied a fair and impartial trial because of the denial of his motion for a

> change of venue from judge. A ruling on a change of
> judge in a criminal proceeding is within the trial court's
> discretion. We review such a ruling only for a clear
> abuse of discretion. Here, defendant states no facts in
> his brief before this court, nor can we find any in the
> record, that indicate that there was an undisputed claim
> of prejudice or that the trial court expressed an opinion
> on the merits of the controversy.

*Harrison v. State*, 644 N.E.2d 1243, 1249 (Ind. 1995) (citing
*Stidham v. State*, 637 N.E.2d 140, 142 (Ind. 1994), and *Harrington v. State*, 584 N.E.2d 558, 561 (Ind. 1992)).

In reviewing the state court's decision, the district court
held that AEDPA deference was inapplicable for two
reasons. First, the district court explained,

> it is evident from its own words that the Indiana Supreme Court did not understand Harrison's claim of
> judicial bias as presenting a question of federal constitutional import, and in consequence it cannot be concluded that the Indiana Supreme Court reached the
> merits of the federal claim which Harrison presents in
> his habeas petition.

*Harrison*, 300 F. Supp. 2d at 701. Alternatively, the district
court concluded that the state supreme court's adjudication
was an unreasonable application of clearly established law.
The district court explained:

> The decisions of the Indiana Supreme Court on the
> question of judicial bias are contrary to Supreme Court
> precedent . . . . This conclusion rests on (1) the Indiana
> Supreme Court's use of an "abuse of discretion" standard, and (2) the Indiana Supreme Court's reference to
> the absence of prejudice in the trial record, juxtaposed
> with the proper federal standard of "a fair trial in a fair
> tribunal before a judge with no actual bias against the

defendant or interest in the outcome of his particular case." *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997).

*Harrison*, 300 F. Supp. 2d at 702 (parallel citations omitted).

The State now challenges both of these determinations. It maintains that the district court's conclusions cannot be reconciled with the Supreme Court's decision in *Early v. Packer*, 537 U.S. 3 (2002). We do not believe *Early* supports the State's argument.

In *Early*, the Ninth Circuit had granted habeas relief to a petitioner on a jury-coercion claim; it had done so without applying AEDPA deference because it had determined that the state court's adjudication of the claim was "contrary to established federal law." *Id.* at 8. In reviewing the Ninth Circuit's ruling, the Supreme Court first observed that there was no question that § 2254 applied: "The jury-coercion claim in respondent's habeas petition is the same claim *rejected on the merits in his direct appeal* to the state appellate court, and the Ninth Circuit correctly recognized that § 2254(d) was therefore applicable." *Id.* (emphasis added).[5] The Supreme Court then went on to address the Ninth Circuit's determination that the state court's adjudication was unreasonable:

> [T]he Ninth Circuit observed that the state court "failed to cite . . . any federal law, much less the controlling Supreme Court precedents." [*Packer v. Hill*, 291 F.3d 569, 578 (9th Cir. 2002).] If this meant to suggest that such citation was required, it was in error. A state-court

---

[5] *Early v. Packer*, 537 U.S. 3 (2002), therefore, does not directly address the district court's first determination in the present case—that the state court failed to adjudicate the federal claim on the merits.

decision is "contrary to" our clearly established prece-
dents if it "applies a rule that contradicts the governing
law set forth in our cases" or if it "confronts a set of
facts that are materially indistinguishable from a
decision of this Court and nevertheless arrives at a
result different from our precedent." *Williams v. Taylor*,
529 U.S. 362, 405-406 (2000). Avoiding these pitfalls
does not require citation of our cases—indeed, it does
not even require *awareness* of our cases, so long as
neither the reasoning nor the result of the state-court
decision contradicts them. The Ninth Circuit's disap-
proval of the Court of Appeal's failure to cite this
Court's cases is especially puzzling since the state court
cited instead decisions from the California Supreme
Court that impose even greater restrictions for the
avoidance of potentially coercive jury instructions.

*Ellis*, 537 U.S. at 8 (parallel citations omitted; emphasis in
original). In sum, *Ellis* holds that a state-court holding is not
contrary to clearly established federal law if it merely fails
to cite Supreme Court precedent, as long as "neither the
reasoning nor the result of the state-court decision contra-
dicts them." *Id.*

The State contends that the holding of *Ellis* is applicable
here because the state court's application of the abuse of
discretion standard in reviewing the judge-bias claim did
not contradict the reasoning of, or the result in, any constitu-
tional judge bias cases. We cannot accept this view for two
reasons. First, as we noted earlier, *Ellis* does not speak in
any terms to the district court's first reason for rejecting
AEDPA deference—that the state court failed to adjudicate
the federal constitutional claim on the merits.

More fundamentally, the Supreme Court of Indiana's
adjudication of Mr. Harrison's judge bias claim was con-

trary to "clearly established Federal law, as set forth by the Supreme Court." 28 U.S.C. § 2254(d)(1). The Supreme Court of Indiana reviewed the due process claim only for a "clear abuse of discretion." *Harrison*, 644 N.E.2d at 1249. In its view, that abuse of discretion only occurs when there is "an undisputed claim of prejudice" or when "the trial court expresse[s] an opinion on the merits of the controversy." *Id.* However, the due process protection, as guaranteed by the federal Constitution, indisputably is much broader. The Supreme Court has stated unequivocally:

> A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "Every procedure which would offer a possible *temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the State and the accused* denies the latter due process of law." *Tumey v. State of Ohio*, 273 U.S. 510, 532 [(1927)]. Such a stringent rule may sometimes bar trial by judges who have *no actual bias* and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14 [(1954)].

*In re Murchison,* 349 U.S. 133, 136 (1955) (emphasis added; parallel citations omitted); *see also Franklin v. McCaughtry*, 398 F.3d 955, 960-61 (7th Cir. 2005). This clear holding of the Supreme Court of the United States cannot be squared with

the view of the Supreme Court of Indiana—that the mandate of the federal Due Process Clause is satisfied as long as there is no "undisputed claim of prejudice" or an expression by the trial court of "an opinion on the merits of the controversy." In short, in determining whether the trial court abused its discretion in denying the change-of-judge motion, the Supreme Court of Indiana employed an unreasonable view of the applicable federal standard as established by the Supreme Court of the United States.[6]

---

[6] In support of its argument that the State's abuse-of-discretion review is appropriate under federal law, the State points to *Tezak v. United States*, 256 F.3d 702 (7th Cir. 2001). *Tezak*, however, did not involve review of a constitutional claim of judicial bias; it involved a motion made pursuant to 28 U.S.C. § 144, which states:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of an adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

In determining whether to grant or deny a motion under § 144, "[t]he court must assume the truth of the factual assertions even if it 'knows them to be false.'" *Tezak*, 256 F.3d at 717 (quoting

(continued...)

### 3. Judge Bias

The general principles concerning a defendant's due process right to an impartial judge are clear in the jurisprudence of the Supreme Court. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. at 136. Although this right encompasses "an absence of actual bias," the contours of this right cannot be defined with "precision." *Id.* Indeed, the Supreme Court has made clear that, when the presiding judge is not impartial, there is a "structural defect[] in the constitution of the trial mechanism" that "def[ies] analysis by 'harmless error' standards." *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991); *see also Edwards v. Balisok*, 520 U.S. 641, 647 (1997); *Franklin*, 398 F.3d at 960-61 (citing *Bracy v. Schomig*, 286 F.3d 406, 414 (7th Cir. 2002) (en banc)). For instance, due process is

---

[6] (...continued)
*United States v. Balistrieri*, 779 F.2d 1191, 1199 (7th Cir. 1985)). Under § 144, therefore, the ruling judge has little discretion whether to grant the motion; if the affidavit supports a claim of bias—even if the judge knows that the facts averred therein are false—the motion must be granted. Because the district court has only a limited range of discretion, any action taken outside of that discretion necessarily will constitute an "abuse" of that discretion. The abuse of discretion standard set forth in *Tezak*, therefore, bears little resemblance to the truly deferential standard applied by the Supreme Court of Indiana in the present case.

Finally, even if *Tezak* and *Balistrieri* established a truly deferential abuse of discretion standard, neither case sets forth "clearly established Federal law, *as determined by the Supreme Court*," the statutory standard according to which we must evaluate the state court's adjudication. 28 U.S.C. § 2254(d)(1) (emphasis added).

violated when a judge presides over a case in which he has a direct, pecuniary interest in the outcome. *Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927). Due process also may be offended if a judge sits in judgment on a contempt citation and uses that proceeding to "give vent to personal spleen or respond to a personal grievance." *Offutt v. United States*, 348 U.S. 11, 14 (1954). In sum, due process is violated when a judge presides in a case that "would offer a possible temptation to the average man . . . to forget the burden of proof required to convict the defendant" or would "lead him not to hold the balance nice, clear, and true between the state and the accused." *Tumey*, 273 U.S. at 532.

We now turn to the events surrounding the change-of-judge motion in the state court. Although it is true that, "[o]rdinarily, we presume that public officials have properly discharged their official duties," *Bracy v. Gramley*, 520 U.S. 899, 909 (1997) (internal quotation marks and citations omitted), this presumption is overcome by the accusation at issue in this case and by Judge Redwine's response to it. As recounted by the district court:

> It was . . . evident throughout the hearing on the motion for change of judge that Harrison's attorneys were going to present a defense based on evidence that there were people other than Harrison of whom Stacy Forsee was in fear, that Chuck Hanmore and Roger Greathouse were among these other people, that the basis of this theory consisted of Stacy Forsee's knowledge of illicit drugs at the Greathouse property, and that Judge Redwine's name would come up in the course of this evidentiary presentation. Knowing that the trial court would have to rule on the admissibility of this evidence, Harrison had sought a change of judge. Harrison's attorneys characterized Judge Redwine's presiding over

this trial as being "in the nature of a conflict."

*Harrison*, 300 F. Supp. 2d at 710.

Counsel for Mr. Harrison attempted, at several points in the hearing, to explain this conflict to Judge Redwine; rather than evaluate this submission, Judge Redwine repeatedly refused "to acknowledge the relevance and the probative value of the information pertaining to the possible motives of others to kill Stacy Forsee." *Id.* at 714; *see generally* State Ct. Vol. 23 at 600-08. Indeed, Judge Redwine went so far as to inform counsel that "[y]our theory doesn't make sense." *Id.* at 611.

Moreover, through his actions, Judge Redwine exhibited the very interest that defense counsel had identified. Judge Redwine demonstrated that he was willing to forsake the role of impartial arbiter and instead assume the role of advocate in establishing that he had no involvement with Greathouse and Hanmore. Having been apprised of the nature of the alleged conflict of interest, Judge Redwine transformed the hearing on the change-of-judge motion into a proceeding to vindicate "the credibility of this Court." *Id.* at 610. By way of example only, the following actions of Judge Redwine support this conclusion: (1) contacting, on an ex parte basis, Roger Greathouse on the day the motion for change of judge was filed for the purpose of securing Greathouse's testimony at the change- of-judge hearing; (2) questioning the ISP Detectives regarding the nature of Forsee's allegations against him; (3) taking judicial notice of criminal records with respect to John Forsee, the victim's brother; (4) making public certain records from the paternity action involving Forsee's son for the purpose of establishing that Judge Redwine harbored no prejudice against Stacy Forsee; (5) eliciting testimony from the attorney who represented Stacy Forsee in the paternity action to establish

that there was no reason for Forsee to be upset with Judge Redwine; (6) questioning Forsee's mother, Gloria, as to whether she had any reason to believe that he would not be fair to both sides in this case; and (7) stating "unequivocally" on the record that

> I have never been to Roger Greathouse's house, never in my life. I have never been to party to any where, at any time where cocaine was under any circumstances. I have never seen a truckload of drugs any where, even in the cases I tried as a Prosecutor, a County Judge, and a Circuit Judge, and a Defense Attorney.

*Id.* at 610. Indeed, Judge Redwine's active participation in the hearing and his statements on the record demonstrate precisely the bias that Mr. Harrison's counsel believed would infect the trial—Judge Redwine's fear that evidence might connect him to individuals involved in the drug trade thereby tainting, or worse ruining, his judicial career. The district court was eminently correct when it concluded that

> [t]his is a case in which actual bias has been demonstrated not by judicial rulings, but by Judge Redwine's personal participation in the development of the proceedings beginning on September 26, 1991. Apart from his rulings, Judge Redwine's statements and actions preceding trial, [and] at the change of judge hearing,[7] . . . illustrate an unmistakable bias infecting James Harrison's trial and depriving him of a fair trial. Judge Redwine revealed a personal interest in protecting his

---

[7]   The district court rested its actual bias determination on Judge Redwine's actions during the hearing on the change-of-judge motion as well as subsequent rulings and actions that followed the hearing. We limit our review to the actions surrounding the change-of-judge motion. *See supra* note 4.

> name and the judiciary in Posey County, an interest he specifically admitted.

*Harrison*, 300 F. Supp. 2d at 714 (footnote and parallel citations omitted). Judge Redwine used the change-of-judge hearing to "give vent to personal spleen [and] respond to a personal grievance." *Offutt*, 348 U.S. at 14. He abandoned the role of "an impartial officer directing the judicial process of truth seeking and invaded the role of an advocate." *United States v. Norris*, 873 F.2d 1519, 1526 (D.C. Cir. 1989). His desire to vindicate his name directed his actions and clouded his reasoning; the judge " 'bec[ame] personally embroiled with the petitioner.' " *Jones v. Luebbers*, 359 F.3d 1005, 1014 (8th Cir. 2004) (quoting *Offutt*, 348 U.S. at 17).[8]

---

[8]  Although Judge Redwine's actions with respect to the change-of-judge motion are sufficient to establish bias, we note that, prior to trial, Judge Redwine did render two evidentiary rulings that involved some of the evidence elicited at the change-of-judge hearing:

> * Judge Redwine held a hearing (with defense counsel on the phone) on the State's motion *in limine* and granted it even though defense counsel indicated that they were still reading the cases cited by the State. Through this ruling, Judge Redwine ordered defense counsel not to mention directly or by inference in the presence of the panel, the jury panel, that the defense were alleging that anyone else could have or may have been a suspect in the case without first seeking permission of the court outside the presence of the jury.

> . . .

> * Judge Redwine entered an order that excluded defense witnesses disclosed after October 1, 1991. This date was just five calendar days after his ruling on Harrison's motion for change of judge. The defense witness list included the names

(continued...)

Mr. Harrison did not receive a trial by a judge free from actual bias. His rights under the Due Process Clause were violated, and he has met his burden of establishing that he is in custody in violation of the Constitution of the United States.

## Conclusion

For the foregoing reasons, the judgment of the district court granting the writ of habeas corpus is affirmed.

AFFIRMED

A true Copy:

    Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

---

[8] (...continued)
    of Roger Greathouse, Charles Hanmore, and Joe "Tattoo."

300 F. Supp. 2d at 711 (citations omitted). Thus, just as Mr. Harrison's attorney had predicted during the change-of-judge hearing, Judge Redwine was called upon "to rule on the Motions with respect to whether the Prosecution's hearsay is admissible, and whether the Defense's hearsay is admissible" and to determine whether defense counsel would be allowed to "counteract" evidence of the victim's fear "with certain evidence that there are other people who are involved that had a reason or a motive to kill her." State Ct. Vol. 23 at 600, 603.

---